ZELLERBACH PAPER COMPANY, PETITIONER, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

CROWN ZELLERBACH CORPORATION, PETITIONER, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

Docket Nos. 3106, 3786.   Promulgated March 10, 1947.

*Duncan Low, Esq., Scott C. Lambert, Esq.,* and *Sigvald Nielson,
Esq.,* for the petitioners.

*T. M. Mather, Esq.,* for the respondent.

512

OPINION.

HARRON, *Judge*: *Issue I.—Recoveries of bad debts.*—All the facts relating to this issue have been stipulated by the parties. The stipulations are incorporated herein by this reference and are adopted as the findings of fact.

Petitioners keep their books and file their returns on the basis of a fiscal year ending on April 30. They first became subject to excess profits tax for the fiscal year ended April 30, 1941.

Prior to the fiscal years here in controversy, petitioners received permission from the Commissioner of Internal Revenue to employ the reserve method of accounting for bad debts for income tax purposes. During the fiscal years in question petitioners accounted for bad debts by the use of such reserve method.

The system used by petitioners, which was approved by the Commissioner, provides for specific reserves as well as for a general reserve for bad debts. At the end of the fiscal year petitioners examine their various accounts and notes receivable. Based upon past experience with particular customers and other information, petitioners establish on their books specific reserves for certain individual accounts. For example, on March 31 petitioners might have an account receivable in the amount of $10,000 owing from X. Petitioners decide that X's financial position requires them to establish a 75 per cent reserve, since it appears that X will be able to pay only one-fourth of the total amount due. Petitioners would then set up on the books a specific reserve keyed to X's account in the amount of $7,500.

The system further provides that, after the necessary specific reserves have been established for individual accounts, an addition be made to the general reserve for bad debts to take care of the remaining accounts and notes receivable.

The total of the specific reserves set up in the fiscal year plus the addition to the general reserve would be the amount, except as ad-

justed in a manner described hereinafter, which petitioners would be entitled to deduct as bad debts for income tax purposes.

Petitioners' reserve system requires certain adjustments. One relates to cash recoveries on receivables which have been written off the books as uncollectible and charged to the general reserve for bad debts. The effect for excess profits tax purposes of petitioners' treatment of these cash recoveries raises the first question to be decided.

In petitioners' fiscal year beginning on May 1, 1939, and prior thereto, certain receivables were deemed uncollectible and written off the books. Such write-offs were charged against the general reserve for bad debts.

In the fiscal years in question, payments were received on some of these accounts previously written off the books. Such payments were initially credited to a "Losses & Recoveries" account as cash recoveries, and, at the end of each fiscal year, cleared into the general reserve for bad debts.

The parties are agreed on the exact amount of these cash recoveries. They are also agreed that the cash recoveries reduced the amount of petitioners' bad debt deductions for the fiscal years in question, since the cash recoveries decreased the additions to the general reserve for bad debts which petitioners would have made.

Section 711 (a) (1) (E) and section 711 (a) (2) (H) provide that there shall be excluded from excess profits net income, income attributable to the recovery of a bad debt if a deduction with reference to such debt was allowable from gross income for any taxable year beginning prior to January 1, 1940.

The trial of these proceedings was held prior to this Court's decision in *Boyd-Richardson Co.*, 5 T. C. 695, and the respondent's briefs were filed before he amended his regulations. At the time the respondent filed his briefs in these proceedings, the respondent's regulations provided that section 711 (a) (1) (E) and section 711 (a) (2) (H) were not applicable to a taxpayer using the reserve method for bad debts unless the cash recoveries were taken directly into gross income and not, as here, credited to the reserve account. T. D. 5421, 1944 C. B. 797. In *Boyd-Richardson Co.*, *supra*, we disapproved of these regulations as contrary to the statute, saying "Net income would be exactly the same in each year regardless of which method was used [that is, reporting as gross income or crediting to the reserve], and there is no reason to suppose that Congress intended excess profits net income and the resulting tax to be different, depending upon the choice of method used." Respondent has since amended his regulations to conform to the holding made in the *Boyd-Richardson* case and to make the above sections applicable to taxpayers using the reserve method of treating bad debts, regardless of whether the recoveries

are included in gross income or credited to the bad debt reserve. T. D. 5496, February 27, 1946. See *Ralphs-Pugh Co.*, 7 T. C. 325.

The facts here bring the question squarely within the rule of *Boyd-Richardson Co., supra*, and T. D. 5496. In other words, we now understand that respondent would not now argue as he originally argued with respect to this question, although he has not filed any supplemental brief conceding that petitioners' contention is correct. On the authority of the *Boyd-Richardson* case, the cash recoveries involved herein, the amounts of which are not in dispute, are excludible from excess profits net income under section 711 (a) (1) (E) for the Crown Zellerbach Corporation and under section 711 (a) (2) (H) for the Zellerbach Paper Co.

There is a further question under this issue, which relates to adjustments made by petitioners in the fiscal years to their specific reserves for bad debts. Under petitioners' reserve system, cash payment of all or part of an account receivable for which a specific reserve has been set up, or improvement in the financial position of the customer, is reflected as a reduction in specific reserve requirements for the current fiscal year by what petitioners term "reversals to income." Just as cash recoveries credited to the general reserve for bad debts reduce the amount of the addition necessary to the general reserve for any fiscal year, so cash recoveries on specific reserves and improved financial position of customers reduce the total dollar amount of new specific reserves which petitioners have to set up on their books. In both cases, the cash recoveries and improved financial position of customers reduce the bad debt deduction which petitioners would take on their income tax returns. This can best be demonstrated by an examination of the facts and figures pertaining to the Crown Zellerbach Corporation for the fiscal year ended April 30, 1941. These facts and figures are typical of what took place in each fiscal year for both petitioners.

In its income tax return for the fiscal year 1941, Crown Zellerbach deducted bad debts in the sum of $22,905.17. However, at the close of the year Crown Zellerbach had determined that it had to set up specific reserves in the amount of $44,963.71 and that it had to add to its general reserve for bad debts the sum of $23,742.23. Together with a special reserve in the amount of $2,000 which is not in issue, Crown Zellerbach would have been entitled to deduct a total of $72,705.94 as bad debts for the fiscal year 1941.

Instead of adding $23,742.23 to the general reserve, Crown Zellerbach added only $17,303.62. The difference consisted of cash recoveries in the amount of $6,438.61,[1] which, as mentioned previously, were

---

[1] $5,110.61 of this $6,438.61 represented recoveries on bad debts which had been deducted in the fiscal year beginning on May 1, 1939, or prior thereto.

credited to the general reserve and reduced the amount of the addition which had to be made at the end of the year.

In the fiscal year beginning on May 1, 1939, or prior thereto, Crown Zellerbach had set up, and deducted for income tax purposes, certain specific reserves in the amount of $44,494.73. In the fiscal year 1941 it made collections in cash applicable to these specific reserves in the amount of $44,353.93 and ascertained the improved financial condition of customers for the $140.80 balance. Of the cash recovered, $3,132.57 was credited to "Miscellaneous Income" and directly reflected in gross income. The balance of $41,362.16, all but $140.80 of which was cash, was "reversed to income" in the sense that it was used to offset and to reduce the $44,963.71 of new specific reserves which were required to be set up. Thus the total of specific reserves was increased only in the amount of $3,601.55, instead of $44,963.71; and only this $3,601.55 was included in the bad debt deduction for the fiscal year 1941.

Hence, instead of claiming a bad debt deduction of $72,705.94, consisting of new specific reserves, an addition to the general reserves, and the special reserve not in dispute in the respective amounts of $44,963.71, $23,742.23, and $2,000, Crown Zellerbach claimed only the sum of $22,905.17, consisting of new specific reserves in the amount of $3,601.55, an addition to general reserve in the amount of $17,303.62, and the $2,000 special reserve.

The difference between the $72,705.94 requirement and $22,905.17 deduction claimed resulted from (1) the cash recoveries credited to the general reserve, and (2) the cash recoveries on specific reserves and improved financial position of customers which were "reversed to income."

It is clear that the "reversal to income" of the cash recoveries applicable to specific reserves must be treated for excess profits tax purposes the same way as the cash recoveries credited to the general reserve. In the one instance the recoveries reduce the amount of new specific reserves to be set up; in the other instance the recoveries reduce the amount of the addition to general reserve. The bad debt deduction allowable to petitioners for income tax purposes consists of the total of new specific reserves and the addition to the general reserve. Without the cash recoveries, whether the recoveries are credited to specific reserves or to the general reserve, petitioners' bad debt deduction would be greater and petitioners' taxable income would be less. The fact that one recovery is keyed for bookkeeping purposes to specific reserve accounts and the other recovery to a general reserve is completely without significance.

The cash recoveries applicable to the specific reserves were "reversed to income" under a reserve method for bad debts which had been approved by the Commissioner. The parties are agreed as to

the amounts involved. We hold that the "reversals to income" based upon the cash recoveries resulted in income attributable to the recovery of bad debts under section 711 (a) (1) (E) and section 711 (a) (2) (H).

However, the "reversals to income" which were based upon the improved financial position of customers for whom specific reserves had been set up requires a different result. True these "reversals" served to reduce the dollar amount of new specific reserves which were established in the fiscal years, and thus to decrease the amount of petitioners' bad debt deduction. But such decrease in bad debt deduction was not in any way attributable to the recovery of a bad debt. Before section 711 (a) (1) (E) and section 711 (a) (2) (H) can apply, there must first be "the *recovery* of a bad debt." (Italics supplied.) What petitioners did in the fiscal years was to ascertain that certain debts were worth more than petitioners had previously valued them. But petitioners actually recovered nothing. Until a recovery of a bad debt has been had, the above mentioned sections are not called into play.

Respondent is correct in treating this type of "reversal to income" as a mere bookkeeping adjustment. The fact that the bad debt deduction for income tax purposes is decreased by the adjustment is immaterial. Income attributable to the recovery of a bad debt is not realized where an adjustment is made to a specific reserve to reflect an improvement in the paying ability of the debtor any more than it is realized where no specific reserve is initially set up because of the sound financial position of the customer. Yet in both instances, the bad debt deduction for income tax purposes is similarly affected.

The parties are also agreed upon the amounts involved in the "reversals" due to the improved financial condition of customers for whom specific reserves had been set up. We hold that such amounts are not excludible from excess profits net income under section 711 (a) (1) (E) and section 711 (a) (2) (H).

*Issue II.—Amortization or depreciation in connection with the Glines Canyon Hydroelectric Power Plant.*—The parties have stipulated most of the facts applicable to this issue. The stipulations are incorporated herein by this reference, and are adopted as the findings of fact.

In 1936 the Crown Zellerbach Corporation acquired all the properties of the Northwestern Power & Light Co. in a transaction to which section 112 (b) (6) of the Revenue Act of 1936 applied.

On June 4, 1926, the Federal Power Commission issued to Northwestern a license to construct a hydroelectric power plant in Glines Canyon on the Elwah River in the State of Washington. The Federal Power Commission issued the license pursuant to the Federal Water

Power Act, which authorizes the Commission to prescribe the conditions under which licenses will be issued for power projects located upon public lands.

The license was for a period of 50 years. The license was issued upon the condition, among others, that the actual legitimate cost of the project should be subject to determination by the Federal Power Commission, and that the United States might recapture the project by giving written notice of its intention to do so.

Section 14 of the Federal Water Power Act provides that in the event of recapture by the United States the price to be paid to the licensee shall be the net depreciated investment at the time of recapture or a sum not to exceed the then fair value of the project, whichever is the lesser.

The project was completed and placed in operation in May 1927 at a claimed cost of $2,228,623.73.

The Federal Power Commission has established a uniform system of accounts which must be followed by original licensees, such as Northwestern, and by successor licensees, such as Crown Zellerbach.

Originally Northwestern was erroneously advised by an auditor of the Federal Power Commission that certain expenses incurred in the construction of the hydroelectric plant in the amount of $211,209.81 should be charged to a nondepreciable or nonamortizable account entitled "Power Plant Land Account," which was listed in the uniform system of accounts prescribed by the Commission.

Subsequently the error was discovered by the Federal Power Commission. On January 11, 1944, the Commission made an order requiring Crown Zellerbach to transfer $197,787.67 of the $211,209.81 from the account known as the "Power Plant Land Non-depreciable Account" to a depreciable or amortizable account known as the "Reservoirs, Dams & Waterways Account" in the Federal Power Commission's uniform system of accounts. These expenditures had been made in 1927. The total sum $197,787.67 represented expenditures incurred by Northwestern for clearing production land, preliminary engineering, surveys, and other construction items necessary to bring the hydroelectric plant into operation. The expenditures were all made on Government land covered by the license issued to Northwestern.

The parties are agreed that, under the Federal Power Commission's uniform system of accounts, the $197,787.67 was correctly includible in the depreciable or amortizable account known as "Reservoirs, Dams & Waterways."

In the income tax returns filed by Northwestern and Crown Zellerbach for the years 1927 through 1940, no deduction was claimed by Northwestern and Crown Zellerbach, or allowed by respondent, for depreciation or amortization on the above construction costs because

they had been allocated erroneously to the nondepreciable "Power Plant Land Account". (Reference to "depreciation," hereinafter, means depreciation or amortization allowance on account of the construction costs aggregating $197,787.67.) The income tax and excess profits tax returns of petitioner Crown Zellerbach Corporation for the fiscal years 1941 and 1942 were filed prior to the above order of the Federal Power Commission. Consequently, in computing net income for the fiscal years 1941 and 1942, petitioner did not deduct in the income tax returns for those years any amounts as depreciation allowance on the above construction costs, and, consequently, the normal tax net income for each of the years involved here was carried over from the respective income tax returns into the excess profits tax returns without any reduction on account of any allowance for depreciation deductions with respect to the above construction costs. Also, in the excess profits tax returns filed for the fiscal years 1941 and 1942, the base period income for each of the fiscal years ended April 30, 1937 to 1940, inclusive, which was used in computing the credit, was not reduced by a deduction for depreciation relating to the above construction costs.

In his notice of deficiencies determined in excess profits tax for the fiscal years 1941 and 1942, which gives rise to this proceeding, the respondent, obviously, made no adjustments relating to such depreciation because none had been claimed.

Crown Zellerbach filed its petition in this Court for redetermination of its excess profits tax liability for the years 1941 and 1942 prior to the order of the Federal Power Commission transferring the $197,787.67 of construction costs to a depreciable account. Therefore, Crown Zellerbach Corporation did not make any claim in its petition for a deduction for depreciation in computing its income tax and excess profits tax.

Subsequent to the order of the Federal Power Commission, Crown Zellerbach filed an amended petition in this Court, alleging that respondent erred in failing to allow as a deduction from normal tax net income for each fiscal year 1941 and 1942 the sum of $3,955.75 as depreciation on the $197,787.67 of construction expenditures. The $3,955.75 represents depreciation at the rate of 2 per cent per year on a capital investment of $197,787.67 held under a license terminable at the end of 50 years.

We do not have before us in this proceeding any question relating to the income tax liability of Crown Zellerbach for the fiscal years 1941 and 1942. The first question under this issue, however, relates to determination of the correct amounts of the normal tax net income for each fiscal year involved. If petitioner is entitled to deduct $3,955.75 in each fiscal year involved as depreciation allowance, then

it follows that the normal tax net income for each fiscal year, for purposes of computing the excess profits net income for each fiscal year, will be reduced by the amount of $3,955.75. This is what petitioner now claims, and respondent does not dispute this claim of petitioner. Respondent realizes that the construction costs in the total amount of $197,787.67 clearly were capital expenditures which are amortizable over the 50-year period of the license. *Scovill Mfg. Co.*, 25 B. T. A. 265, 277; *Ralphs-Pugh Co.*, *supra*, p. 330.

It is held that the normal tax net income of Crown Zellerbach Corporation for each fiscal year should be reduced by the sum of $3,955.75 for the purpose of computing the excess profits net income under section 711 (a) of the Internal Revenue Code for each fiscal year.

The above holding disposes of a minor question involved under this issue, and clears the way for consideration of the next question which has been put in issue by the respondent by his amended answer to the amended petition.

The respondent contends that the base period income of Crown Zellerbach for its base period fiscal years ending April 30, 1937, to April 30, 1940, inclusive, must be reduced to reflect like deductions for annual depreciation allowance with respect to the same construction costs of $197,787.67. He argues that if the depreciation allowances are to be taken into consideration in computing the excess profits net income for the 1941 and 1942 fiscal years (as has been held above), they must be taken into consideration also to reduce the amounts of the base period income for the purpose of computing the *excess profits credit* under section 713 of the Internal Revenue Code.

In its amended petition, Crown Zellerbach made no concession, or reference to, a reduction in base period net income on account of such depreciation for the purposes of the excess profits credit. The issue was raised by the respondent in his answer to the amended petition.

Crown Zellerbach computed its excess profits credit under the income method prescribed in section 713 of the Internal Revenue Code. The credit is made up in part of 95 per cent of the average base period net income. The greater the income in the base period years, the larger the *credit* and smaller the excess profits tax under section 710 of the Internal Revenue Code. In this instance, the excess profits tax for each fiscal year, 1941 and 1942, would be larger if the excess profits credit based upon base period income were smaller than Crown Zellerbach computed in the respective excess profits tax returns which it filed for the years here involved. The credit, clearly, would be less than was taken and allowed under the returns if the base period income were reduced in each base period year by deductions for depreciation on the construction costs. Respondent is asking now for such decrease in the base period income and excess profits credit.

Petitioner does not resist this contention of the respondent. The reason is that petitioner counters with another claim, as will be set forth later, which gives rise to the real question under this issue. That question arises under section 734 of the Internal Revenue Code, but before we can reach the controversial question, the contention of the respondent, set forth above, must be disposed of.

The broad question is, What is the correct amount of Crown Zellerbach's excess profits tax for each fiscal year ended April 30, 1941, and April 30, 1942. Since respondent now challenges the correctness of the amount of the excess profits credit to be used, under his pleadings, we must determine the correct amount of the excess profits credit which may be used, and that determination depends upon whether or not the base period income shall be reduced as respondent contends. We agree with the parties that the base period income must be reduced for depreciation or amortization of the construction costs.

Although in the base period years, no deduction from gross income for such depreciation was claimed by Crown Zellerbach, or allowed by respondent, the $197,787.67 expended in 1927 in the construction of the power plant was a capital expenditure upon which depreciation was "allowable." *Virginian Hotel Corporation of Lynchburg* v. *Helvering*, 319 U. S. 523; *Rainier Brewing Co.*, 7 T. C. 162, 178. We are empowered to take such fact into consideration in determining the correct amount of the excess profits credit. See *Pacific Gas & Electric Co.*, 7 T. C. 1142, 1147, 1148; secs. 272 (g) and 729 (a) of the Internal Revenue Code; and the cases cited in footnote 5 of *Commissioner* v. *Gooch Milling & Elevator Co.*, 320 U. S. 418. Accordingly, it is held that, since a depreciation deduction from gross income in the amount of $3,955.75 was allowable in each of the base period years ended April 30, 1937, to April 30, 1940, inclusive, such deductions must be taken into account to reduce the average base period net income used in computing Crown Zellerbach's excess profits credit under section 713.

The above holding disposes of the question raised by the respondent by his amended answer, and we now come to the main question under this issue.

Petitioner Crown Zellerbach contends that if respondent's contention as above set forth is sustained so as to reduce its average base period net income in computing its excess profits credit, then it is entitled to an adjustment under section 734 of the Internal Revenue Code in its income tax liability for prior taxable years. Petitioner contends that the adjustment will involve years going back to the fiscal year ended April 30, 1928.

For reasons stated hereinafter, we believe that petitioner's contention must be sustained in part; i. e., that adjustment under section 734 should be made with respect to its income tax liability for the fiscal

years ended April 30, 1937, to April 30, 1940, inclusive, the base period years; but that the adjustment can not be made properly with respect to petitioner's income tax liability for years prior to the fiscal year which ended in 1937.

At the outset, the mechanics involved in this contention of the petitioner should be noted. Form 1121, the corporation excess profits tax return, is designed so that the amount of the excess profits tax due for a taxable year is arrived at before there is any reference to section 734 of the Internal Revenue Code. If an adjustment should be authorized by section 734 by which the income tax liability of the taxpayer for earlier years is reduced by reason of the adjustment, the taxpayer subtracts the amount of the reduction from the amount of the excess profits tax for the taxable year in question. If petitioner is sustained in its contention under section 734, it will receive the benefit of a reduction in its excess profits tax for only one year, the first taxable year involved here, which ended on April 30, 1941.

Section 734,[2] effective for taxable years beginning after December 31, 1939, was added to the Internal Revenue Code by the excess profits tax amendments of 1941. Since the years involved here are fiscal years ended in 1941 and 1942, it is proper to consider section 734.[3] The provisions thereof which are pertinent are set forth in the margin. By its terms, section 734 authorizes making adjustments upwards or down-

---

[2] SEC. 734. ADJUSTMENT IN CASE OF POSITION INCONSISTENT WITH PRIOR INCOME TAX LIABILITY.

\*       \*       \*       \*       \*       \*       \*

(b) CIRCUMSTANCES OF ADJUSTMENT.—

(1) If—

(A) in determining at any time the tax of a taxpayer under this subchapter an item affecting the determination of the excess profits credit is treated in a manner inconsistent with the treatment accorded such item in the determination of the income-tax liability of such taxpayer or a predecessor for a prior taxable year or years, and

(B) the treatment of such item in the prior taxable year or years consistently with the determination under this subchapter would effect an increase or decrease in the amount of the income taxes previously determined for such taxable year or years, and

(C) on the date of such determination of the tax under this subchapter correction of the effect of the inconsistent treatment in any one or more of the prior taxable years is prevented (except for the provisions of section 3801) by the operation of any law or rule of law (other than section 3761, relating to compromises),

then the correction shall be made by an adjustment under this section. If in a subsequent determination of the tax under this subchapter for such taxable year such inconsistent treatment is not adopted, then the correction shall not be made in connection with such subsequent determination.

(2) Such adjustment shall be made only if there is adopted in the determination a position maintained by the Commissioner (in case the net effect of the adjustment would be a decrease in the income taxes previously determined for such year or years) or by the taxpayer with respect to whom the determination is made (in case the net effect of the adjustment would be an increase in the income taxes previously determined for such year or years) which position is inconsistent with the treatment accorded such item in the prior taxable year or years which was not correct under the law applicable to such year.

\*       \*       \*       \*       \*       \*       \*

[3] A final determination of the excess profits tax liability is not a prerequisite to an adjustment under section 734. Regulations 112, sec. 35.734–2 (a).

wards in the income tax liability of the taxpayer for a prior taxable year or years. The adjustment shall be made only if there has been an inconsistency as described in subsection (2) of section 734 (b). The Senate and House committee reports show that section 734 is an equitable provision designed to discourage the adoption of inconsistent positions by either the taxpayer or the Commissioner. Section 734 may not be availed of by the party which would receive a tax benefit by virtue of adopting an inconsistent position. See S. Rept. No. 1631; 1942–2 C. B. 504, 659.

In section 35.734–1 (a) of Regulations 112 the respondent has restated in a convenient form the conditions set forth in section 734 (b) which must be satisfied as a prerequisite of obtaining the benefits thereof.[4] Section 734 (b) sets forth conditions which represent three conditions.

In examining the facts in order to ascertain whether the three conditions are satisfied, it is necessary to recognize that the problem results from an order of the Federal Power Commission which was made on January 11, 1944. That order, by changing the accounting classification of certain construction costs to depreciable or amortizable costs, started a "chain reaction" having to do with deductions for depreciation allowances. Under that order, expenditures totaling in excess of $197,000, which were completed in 1927, are depreciable. If deductions had been taken in earlier years for such depreciation, the income tax liability of petitioner and its predecessor would have been slightly lower than it was. The parties are agreed on that point. Deductions for such depreciation were not taken in the earlier years because petitioner and its predecessor were erroneously advised by an auditor of the Federal Power Commission that the expenditures in question were nondepreciable. That resulted in the taxpayer's treating the expenditures in a way that was "incorrect under the law applicable to such years"; i.e., the taxpayer failed to take depreciation deductions which it should have taken under the Federal income tax law applicable to the prior taxable years. We have so held here. There is no real dispute between the parties on this point. The parties are also agreed that "correction of the effect of such erroneous treatment for one or more of the prior taxable years is prevented by the operation of a provision or rule of law," viz., the statute of limitations.

[4] Sec. 35.734–1 [Regulations 112] Purpose and Scope of Section 734.—(a) General.—
Section 734 provides for an adjustment if a determination of a taxpayer's excess profits tax liability treats an item or transaction affecting the excess profits credit inconsistently with the treatment of such item or transaction in the determination of the income tax liability of the taxpayer or a predecessor for a prior taxable year or years. The adjustment is not authorized unless (1) the treatment of the item or transaction for prior taxable years was incorrect under the law applicable to such years, (2) a correction of the effect of such erroneous treatment for one or more of the prior taxable years is prevented by the operation of a provision or rule of law, and (3) the inconsistent position adopted in the determination is asserted and maintained by the party (either the Commissioner or the taxpayer) who would be adversely affected by the adjustment.

Thus the first two conditions of section 734 (b) are satisfied. There is no real dispute between the parties about the fulfillment of the first two conditions set forth in the regulation.

The real problem is whether an inconsistent position is being adopted or has been adopted with respect to the particular item of depreciation, and whether the party adopting the inconsistent position is the petitioner or the respondent, who would be adversely affected by the adjustment.

The item with which we are concerned is an annual deduction of a little more than $3,000 for depreciation. That deduction, when allowed for the base period years, affects the excess profits credit. It also affects the income tax liability of the taxpayer for prior years, reducing such income tax liability. It is the treatment of this item of deduction for purposes of the excess profits credit and the income tax liability for prior years with which section 734 (b) is concerned in this case. Under section 734 (b), the treatment of this item of deduction for purposes of determining the excess profits credit shall not be inconsistent with the treatment of the item for purposes of determining the taxpayer's income tax liability for prior years. (Section 734 (b) is not concerned with the treatment of the item of deduction for the purpose of determining the income tax liability of the taxpayer for the current taxable year.)

In this case the respondent has raised the question and has contended that the excess profits credit to be applied in determining petitioner's excess profits tax for the fiscal years 1941 and 1942 must be reduced to give effect to allowances for depreciation in the base period years for the item of depreciation in question; i. e., his position is that the base period income should be smaller because of the depreciation which was allowable in those years, even though deductions were not taken by the taxpayer. Since the taxpayer did not take deductions in the base period years for the item of depreciation, the respondent's treatment of the item in determining the excess profits credit is inconsistent with the treatment accorded such item in the determination of the taxpayer's income tax liability for the base period (prior taxable) years. Therefore the third condition of section 734 (b) is satisfied, and it follows that petitioner is entitled to receive the adjustment allowed under section 734 (b) for the fiscal years ended April 30, 1937, to and including the fiscal year ended April 30, 1940, for the purpose of computing its excess profits tax for the fiscal year ended April 30, 1941.[5] It is so held.

---

[5] No direct adjustment for the fiscal year ended April 30, 1942, is authorized. Regulations 112, sec. 35.734-2 (c), and S. Rept. No. 1631, *supra,* provide that if a determination of the excess profits tax liability for one taxable year adopts with respect to an item or transaction an inconsistent position which results in an adjustment under section 734, similar treatment of the same item or transaction for subsequent excess profits tax taxable years does not authorize a further adjustment under such section.

Respondent's contention to the contrary is rejected. On brief respondent claims that he is perfectly consistent in contending that Crown Zellerbach must reduce its excess profits credit by the depreciation deduction if the depreciation is used to reduce Crown Zellerbach's excess profits net income for 1941 and 1942. This is true enough, but it overlooks the fact that respondent is claiming that depreciation should be taken into account in determining the excess profits credit, while such depreciation was not taken into account in determining the income tax liability of Crown Zellerbach in the base period years. This latter fact is all-important—not what Crown Zellerbach is doing in 1941 and 1942.

The above holding sustains petitioner's contention under this issue in part, only. Petitioner contends that, because of respondent's inconsistent position on the depreciation deduction item, it is entitled not only to an adjustment in income tax for the base period years ended April 30, 1937 to 1940, inclusive, but also to an adjustment in income tax for all the years prior to April 30, 1937, viz., for the fiscal years ended April 30, 1928, to April 30, 1936, inclusive. Northwestern completed the power plant project in May 1927. Crown Zellerbach acquired the project from its wholly owned subsidiary in 1936 in a transaction to which section 112 (b) (6) of the Revenue Act of 1936 applied. Hence, Crown Zellerbach acquired the property from a "predecessor" within the meaning of section 734 (a) (4) and section 740 (b) (2). Crown Zellerbach is in a position, therefore, to take advantage of an adjustment under section 734 for the failure of the predecessor to claim any deduction for depreciation from gross income in the years subsequent to May 1927 and prior to the base period years. But Crown Zellerbach can do this only if respondent's treatment of the depreciation deduction for purposes of the excess profits credit is inconsistent with the manner in which the depreciation was treated by the predecessor in those earlier years.

We think that no inconsistent treatment exists within the meaning of section 734 as to any years prior to the base period years. An adjustment is available only for a year pertinent to the fixing of the excess profits tax liability. Where the excess profits credit is based upon invested capital (which is not the case here), some transactions may affect the amount of the excess profits credit regardless of the year in which they occur. A change in the treatment of the item for purposes of the credit can rightfully be said to relate back to such earlier years. Thus, if a taxpayer corporation erroneously capitalized an expense in 1923, the Commissioner would, by refusing to allow such expense to be included in invested capital for 1941, open the taxpayer's income tax liability for 1923 to a downward adjustment. But where, as here, the excess profits credit is based on income during certain

base period years, it is difficult to see how an inconsistency relating to the treatment of a deduction for depreciation can be said to go beyond the confines of the base period years. What took place with regard to depreciation in the years ended April 30, 1928 to 1936, inclusive, has no relation to Crown Zellerbach's excess profits tax for 1941. No further adjustment is permitted under that statute than we have allowed.

Reviewed by the Court.

*Decision will be entered under Rule 50.*