A B C BREWING CORP. (FORMERLY AZTEC BREWING COMPANY), A CALIFORNIA CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 6701, 11570. Promulgated May 29, 1953.

*Donald C. McGovern, Esq.*, for the petitioner.
*R. E. Maiden, Jr., Esq.*, and *R. B. Sullivan, Esq.*, for the respondent.

516

518

522

OPINION.

LeMire, *Judge:* The issues will be discussed in the order in which they are set out above.

*Issue 1: Carry-back of Unused Excess Profits Credits for 1945 and 1946.*

The question presented in this issue is whether the unused excess profits credits for the years 1945 and 1946, after petitioner had ceased operations and had distributed all of its assets except cash and U. S. Treasury obligations, may be carried back under the provisions of section 710 (c) (3) (B), Internal Revenue Code, to the prior years 1943 and 1944. Respondent contends that petitioner was de facto dissolved in 1944, citing *Wier Long Leaf Lumber Co. v. Commissioner*, 173 F. 2d 549, and is, therefore, not entitled to a carry-back of excess profits credits from 1945 and 1946. The *Wier Long Leaf Lumber Company* case, among other related cases listed in the margin,[1] is also cited by petitioner.

Petitioner ceased its regular business operations about April 1, 1944, and began distributing its assets to its stockholders. By the close of that fiscal year, October 31, 1944, its remaining assets consisted of cash and U. S. Treasury obligations in the amount of $250,330.84, and it had outstanding liabilities of approximately $16,000, including accrued taxes of approximately $13,000.

That is essentially the same position the corporation in the *Wier Long Leaf Lumber Company* case was in at the beginning of the year 1944. It had previously distributed the major portion of its assets in the process of liquidation but still had on hand at the beginning of 1944 approximately $110,700 of cash, $31,230.83 of "post war refund of excess profits tax," and an insignificant amount of accounts receivable. Its balance sheet showed liabilities of $8,118.86, including $1,250 of accounts payable; Federal income tax payable, $1,974.80; accrued payroll taxes, $195.97; and reserves for contingent liabilities, etc., $4,621.29. On this state of its affairs, the court held that the corporation, though not dissolved, de jure must be regarded for the purpose of its claims for unused excess profits credit carry-back for 1944 as de facto dissolved, and, therefore, not entitled to an unused excess profits credit carry-back. However, a carry-back was allowed for 1943, the court saying:

---

[1] *Bowman* v. *Glenn*, 84 F. Supp. 200, affd., 184 F. 2d 670; *Whitney Manufacturing Co.*, 14 T. C. 1217; *Winter & Co. (Indiana)*, 13 T. C. 108; *Gorman Lumber Sales Co.*, 12 T. C. 1184; *Mesaba-Cliffs Min. Co. v. Commissioner*, 174 F. 2d 857; *Rite-Way Products, Inc.*, 12 T. C. 475.

When on January 1, 1943, petitioner began the year, it had assets worth nearly $1,000,000, including more than $100,000 of accounts receivable, subject to liabilities of $542,539.42. Its liquidation had just begun. It was still in form and in fact a corporation, still carrying on, in winding up, the business for which it was incorporated, still making some, though small, profits, still engaged in necessary and orderly liquidation. Having entered the year as a going corporation, it continued to be a going corporation, at least for the whole of that year.

· Other cases in which the carry-back of unused excess profits credits or operating losses were disallowed under the rule of the *Wier Long Leaf Lumber Company* case, are: *Winter & Co. (Indiana)*, 13 T. C. 108; *Gorman Lumber Sales Co.*, 12 T. C. 1184; and *Rite-Way Products, Inc.*, 12 T. C. 475. See, also, *Whitney Manufacturing Co.*, 14 T. C. 1217, which was distinguished from those cases on its facts.

On the facts in the instant case, we think that the petitioner must be held to have been de facto dissolved at the beginning of the fiscal year 1945 and, consequently, not entitled to a carry-back of excess profits credit from that year or from 1946.

*Issue 2: Computation of Average Base Period Net Income Under Section 713 (f).*

This issue involves the application of subsections (6) and (7) of section 713 (f), Internal Revenue Code. Section 713 pertains, generally, to the determination of excess profits credit based on income. Subsection (f) relates to the determination of average base period net income when there are increased earnings in the last half of the base period, and provides certain formulas for that purpose. Subsection (f) (6) limits the average base period net income determined under subsection (f) to "the highest excess profits net income for any taxable year in the base period." Subsection (7) provides a further limitation on the excess profits net income for any base period year ended after May 31, 1940, aimed at limiting the benefits to be derived from application of the growth formula under subsection (f) to the increase in earnings occurring prior to June 1, 1940. See report of Committee on Ways and Means, 1941-1 C. B., pp. 554-555. These subsections, insofar as here material, are set out in the margin.[2]

---

[2] SEC. 713. EXCESS PROFITS CREDIT—BASED ON INCOME.

(f) AVERAGE BASE PERIOD NET INCOME—INCREASED EARNINGS IN LAST HALF OF BASE PERIOD.—The average base period net income determined under this subsection shall be determined as follows:

\* \* \* \* \* \* \*

(6) The amount ascertained under paragraph (5) shall be the average base period net income determined under this subsection, except that the average base period net income determined under this subsection shall in no case be greater than the highest excess profits net income for any taxable year in the base period. For the purpose of such limitation if any taxable year is of less than twelve months, the excess profits net income for such taxable year shall be placed on an annual basis by multiplying by twelve and dividing by the number of months included in such taxable year.

(7) For the purposes of this subsection, the excess profits net income for any taxable year ending after May 31, 1940, shall not be greater than an amount computed as follows:

(A) By reducing the excess profits net income by an amount which bears the same

It is stipulated that petitioner's gross sales and excess profits net income (or loss) for the base period years were:

| Year | Gross sales | Excess profits net income (or loss) |
|---|---|---|
| F. Y. 1937 | $1,982,399.06 | ($13,243.59) |
| F. Y. 1938 | 1,650,941.07 | (126,291.35) |
| F. Y. 1939 | [1] 1,669,933.23 | 9,457.49 |
| F. Y. 1940 | [2] 1,918,057.29 | 80,052.71 |

[1] Includes $9,292.11 sales of beers not manufactured by petitioner.
[2] Includes $5,953.21 sales of beers not manufactured by petitioner.

Petitioner contends that its average base period net income, after the limitations imposed by subsection (f) (6), is $79,867.81. Respondent has determined that petitioner's average base period net income must be further limited by subsection (f) (7) to $50,530. Petitioner offers no reason for rejecting respondent's computation other than the bare statement that it is contrary to the "clear and unambiguous language of the statute." It seems to us, however, that the plain wording of the statute requires the computations of the average base period net income in the manner followed by the respondent. There is nothing in the statute to indicate that the limitation provided in subsection (f) (7) was not intended to apply, along with that in subsection (f) (6), in the determination of the average base period net income under section 713 (f). The subsections deal with different phases of the computation of average base period net income; (f) (6) limits the average base period net income for all base period years to the highest excess profits net income for any one of those years, while (f) (7) limits the net income of any base period year extending beyond May 31, 1940, to the amount computed under the formula provided therein.

The respondent's determination, in this respect, has not been shown to be erroneous.

*Issue 3: Adjustment of Excess Profits Tax Credit Under Section 713 (g) (4)—Earnings and Profits Available for Distribution to Shareholders in 1944, Reduced by the Estimated Excess Profits Tax for That Year.*

The adjustment in question is shown in respondent's notice of deficiency in Docket No. 11570, as follows:

ratio thereto as the number of months after May 31, 1940, bears to the total number of months in such taxable year; and

(B) By adding to the amount ascertained under subparagraph (A) an amount which bears the same ratio to the excess profits net income for the last preceding taxable year as such number of months after May 31, 1940, bears to the number of months in such preceding year. The amount added under this subparagraph shall not exceed the amount of the excess profits net income for such last preceding taxable year.

### COMPUTATION OF NET CAPITAL REDUCTION

On or about March 31, 1944 you made a distribution to your stockholders in the amount of $750,000.00. Of this distribution it has been determined that the amount of $100,000.00 was not out of earnings and profits. In accordance with the provisions of section 713 (g) (2) of the Internal Revenue Code there is determined a net capital reduction of $58,469.95 as shown in the following:

$100,000.00×214/366_____ $58, 469. 95

### COMPUTATION OF EXCESS PROFITS CREDIT

Average base period net income_____ $50, 530. 19

95 per cent of $50,530.19_____ 48, 003. 68
Less: 6 per cent of $58,469.95 net capital reduction_____ 3, 508. 20

Excess profits credit determined_____ $44, 495. 48

It is stipulated that in computing a $3,508.20 net capital reduction for the fiscal year 1944, respondent reduced petitioner's earnings and profits for the fiscal year by $278,492.82, which was the excess profits tax on said fiscal year profits, as estimated by respondent.

There is no other evidence bearing on this issue.

The excess profits credit based on income, under section 713 of the Internal Revenue Code, is 95 per cent of the average base period net income (713 (a) (1) (A)), plus 8 per cent of the net capital additions (713 (a) (1) (B)), minus 6 per cent of the net capital reductions (713 (a) (1) (C)), as defined in subsection (g). Subsection (g) (4) provides that:

The daily capital reduction for any day of the taxable year shall be the aggregate of the amounts of distributions to shareholders, not out of earnings and profits, after the beginning of the taxpayer's first taxable year under this subchapter and prior to such day.

Respondent has ruled that in determining whether, for the purpose of section 713 (g) (4), a distribution to stockholders was made from earnings or profits of the taxable year such earnings and profits must be reduced by the amount of the accrued excess profits tax for that year. See I. T. 3719, 1945 C. B., p. 265.

Where the excess profits credit is computed on the basis of invested capital, under section 718, the excess profits tax liability of each taxable year must be accrued at the end of that year and serves to reduce the accumulated earnings and profits at the beginning of the next succeeding taxable year rather than those of the current year. *Stern Brothers & Co.*, 16 T. C. 295; *Gorman Lumber Sales Co., supra.*

Section 713, relating to the computation of excess profits credit based on income, contains no provision similar to that found in

section 718 (c) (3),[3] dealing with the computation of excess profits credit based on invested capital, which expressly prohibits the deduction of the current year's excess profits tax in determining the earnings and profits available for distribution.

There is no actual inconsistency in the different treatment accorded the accrued excess profits taxes under sections 713 and 718. In each instance the taxes for the current year are accrued at the end of the year with a resulting decrease in earnings and profits of that year and a reduction of the invested capital of the succeeding taxable year.

Respondent properly reduced petitioner's earnings and profits for the taxable year 1944 by the amount of the accrued excess profits tax for that year. Since the correct amount of the tax is an issue in these proceedings, an adjustment of the accrual must be made under a Rule 50 recomputation.

*Issue 4: Bad Debt Reserve Adjustments—Alleged Overstatement of Income for 1943 and Understatement for 1944.*

Petitioner maintained a bad debt reserve account based on 14 per cent of its accounts and notes receivable. For the fiscal year ended October 31, 1942, it claimed an addition to its bad debt reserve of $30,470.72 which was $18,639.77 in excess of 14 per cent of its accounts and notes receivable. Respondent disallowed the said amount of $18,639.77 as a deduction in that year. In its books, however, petitioner did not reduce its bad debt reserve as of the close of the year 1942 to reflect the adjustment made by respondent. It claimed a deduction in its 1943 return of $35,622.84, representing the difference between the addition to its reserve in that year, $42,456.76, and the amount recovered on accounts previously charged to the reserve, $6,833.92. Also, at the close of 1943 it debited (reduced) the reserve by the amount of $60,120, representing the excess in the reserve over 14 per cent of accounts receivable. This left a credit balance in the reserve of $28,619.

The notice of deficiency disallowing the deduction of the $18,639.77 in 1942 was received by the petitioner in September 1944. To adjust this disallowance, petitioner deducted that amount from the reserve of that year (1944) and credited it to its surplus account, but did not

---

[3] SEC. 718. EQUITY INVESTED CAPITAL.

(c) RULES FOR APPLICATION OF SUBSECTIONS (a) AND (b).—For the purposes of subsections (a) and (b)—

\* \* \* \* \* \* \*

(3) *Computation of earnings and profits of taxable year.*—For the purposes of subsection (a) (3) (B) and (b) (2) in determining whether a distribution is out of earnings and profits of any taxable year, such earnings and profits shall be computed as of the close of such taxable year without diminution by reason of any distribution made during such taxable year or by reason of the tax under this subchapter or chapter 1 for such year and the determination shall be made without regard to the amount of earnings and profits at the time the distribution was made.

report it as income in its return. Also, during 1944, petitioner added to the reserve $12,322.28, making a total of $40,941.28 which, after deduction of the $18,639.77, left a balance of $22,301.51. Petitioner reported that amount in its 1944 return as other income.

We have gone to some length in explaining the operation of the bad debt reserve account because of the difficulty we had in understanding just what petitioner's contentions are in this issue. The allegation of error contained in the petition is that:

The Commissioner erred in failing to increase petitioner's reserve for bad debts as of October 31, 1943, by $18,639.77 and thus erroneously determined petitioner's excess profits net income to be $18,639.77 more than the correct amount thereof.

According to petitioner's brief, the result sought, or one of the results, is to restore the $18,639.77 item to 1944 bad debt reserve account, with a resulting increase in the excess profits tax income of that year. As above shown, the balance in the reserve was carried into income in 1944, after the petitioner had begun liquidation and there was no longer any need for the bad debt reserve. As a corollary to this contention, petitioner contends, under Issue 5, that all of this income from the conversion of the bad debt reserve account to income in 1944 should be excluded from excess profits tax net income either as bad debt recoveries, under section 711 (a) (1) (E), or as abnormal income, under section 721 (b) (1).

We agree with petitioner that, as alleged in its petition, the erroneous treatment of the $18,639.77 in its accounts resulted in an overstatement of 1943 income by that amount. Inasmuch as the amount was disallowed by respondent as an addition to reserve in 1942, and correctly so, as petitioner now concedes, it should have been taken out of the reserve in that year. Petitioner would then have gone into 1943 with a reserve of $31,322.76, instead of $49,962.53, and the excess in the reserve at the close of 1943, 14 per cent of accounts receivable, which was taken into 1943 income, would have been $41,480.23, instead of $60,120.

Likewise, as petitioner contends, it was error to reduce the reserve by the amount of $18,639.77 in 1944, thereby reducing by that amount the balance in the reserve which petitioner converted to income in that year. These are bookkeeping errors which can be readily corrected under the Rule 50 recomputation.

*Issue 5: Unused Bad Debt Reserve—Exclusion From Excess Profits Net Income as Bad Debt Recoveries Under Section 711 (a) (1) (E) or as Abnormal Income Under Section 721 (a) (1).*

Petitioner contends that the balance in the bad debt reserve account which it added to income in 1944, after collection or distribution of

all outstanding notes and accounts receivable, increased by $18,639.77, the item discussed in the next preceding issue, should be excluded from excess profits income either as abnormal income under the provisions of section 721 (a) (1) or as income attributable to the recovery of bad debts under section 711 (a) (1) (E).

We have held that section 711 (a) (1) (E) is inapplicable where there has not been an actual recovery of bad debts. *Zellerbach Paper Co.*, 8 T. C. 511. Moreover, the evidence fails to show that the amount in question, or any portion of it, was not allowed as a bad debt deduction for a taxable year beginning prior to January 1, 1940, as required in section 711 (a) (1) (E). See *J. F. Johnson Lumber Co.*, 3 T. C. 1160; *Ralphs-Pugh Co.*, 7 T. C. 325.

Section 711 (a) (1) (E) being inapplicable, petitioner's relief, if any is due, must be found in section 721 (a) (1). Under that section the question is whether the conversion of the bad debt reserve to income resulted in the receipt in that year of "abnormal income" within the meaning of the statute.

Petitioner's bad debt reserve was a general reserve as distinguished from a reserve for specific bad debts. In each year certain uncollectible accounts were deducted, along with the recoveries on accounts previously debited, and certain additions were credited to the reserve, so that at the end of the year the balance was not in excess of 14 per cent of accounts and notes outstanding. At the beginning of 1944 the reserve stood at $28,619, which is the amount petitioner should have transferred to income in that year after the accounts were all collected or distributed in liquidation. We think that this was income of a separate class and that it was abnormal in petitioner's experience to receive income of such class within the meaning of section 721 (a) (1). It was a class of income similar to that referred to in subsection 721 (a) (2) (D) as "Income includible in gross income for the taxable year rather than for a different taxable year by reason of a change in the taxpayer's accounting period or method of accounting." The Commissioner's regulations provide (Regs. 112, sec. 35.721–8) that:

This class may include such items of income as are includible in gross income for the taxable year by reason of a change from the installment method to the straight accrual method of accounting, a change in inventory method, or a change from the reserve method to the specific charge-off method for the treatment of bad debts. * * *

However, under the regulations (sec. 35.721–3), petitioner is entitled to the exclusion in 1944 of only the amount of abnormal income shown to be attributable "in whole or in part to other taxable years," and, as the regulations further provide, "Items of net abnormal income are to be attributed to other years in the light of the events in which such items had their origin and only in such amounts as are

reasonable in the light of such events." Petitioner recognizes these requirements and states in its brief:

The crux of this issue is the "amount attributable to other years" Section 721 (b), Internal Revenue Code. It is petitioner's contention that to the extent its credit balance in the Reserve for Bad Debts was excessive or greater than needed when it went into its first excess profits tax year (11/1/40–10/31/41) up to the amount of its unused credit balance in said Reserve at October 31, 1944 (when it was no longer needed), it is attributable to these other years prior to November 1, 1940.

Petitioner submits that its reserve at October 31, 1940, of $22,871.48, which was 14 per cent of its outstanding notes and accounts receivable, was excessive to the extent of $16,240.25, since all but $6,631.23 of such notes and accounts receivable were subsequently collected; that this excess remained in the reserve until the account was closed in 1944; and that of the $28,619 properly to be taken into normal income in that year, $16,240.25 should be excluded from excess profits net income.

What gave rise to the taxable income in 1944 was not that the balance in the reserve represented excessive additions made to the reserve in prior years but rather that it represented additions which had been allowed as deductions in prior years. Thus, the amounts of the 1944 reserve attributable to prior years would depend upon the deductions taken in the prior years; and the extent of petitioner's relief for 1944 under subsection 721 (c) would depend upon the effect of the reallocations on the excess profits taxes for those prior years.

A reasonable allocation might be made, we think, by allocating the 1944 reserve to the excess profits tax years 1941, petitioner's first excess profits tax year, 1942, and 1943, in proportion to the correct additions to the reserve (that is, the amounts allowed) in those years as shown in the analysis of the account appearing in finding 11 above. Since, however, there was a balance in the reserve at the beginning of 1941 (November 1, 1940) of $22,871.48, a like proportion of the 1944 balance of the reserve should first be allocated to years prior to 1941 and eliminated from further consideration in the excess profits tax computation.

### 722 Issue: Change in the Character of the Business.

In support of its claim for relief under section 722, petitioner contends that during the base period it changed the character of its business within the meaning of section 722 (b) (4) and that as a result of such change its average base period net income is an inadequate standard of normal earnings.

Petitioner's base period years are the fiscal years ended October 31, 1937, 1938, 1939, and 1940. Its actual profits or losses for the base period years, and its excess profits tax net income for the years 1941 to 1944, inclusive, as determined by respondent, were as follows:

| Base period years | | Excess profits tax years | |
|---|---|---|---|
| 1937 loss | $13,243.59 | 1941 | $85,911.72 |
| 1938 loss | 126,291.35 | 1942 | 538,385.86 |
| 1939 profit | 9,457.49 | 1943 | 844,062.28 |
| 1940 profit | 80,052.71 | 1944 | 321,127.34 |

For its base period years petitioner had an average loss of $12,506.18. Its average base period net income, as determined by respondent under the provisions of section 713 (f), was $50,530.

The relief sought by petitioner is based upon a proposed constructive average base period net income of $251,128.85. In arriving at this figure, petitioner starts with the actual 1939 earnings of $9,457.49, to which it adds constructive increased earnings attributable to the alleged qualifying changes as follows:

| | |
|---|---|
| (a) Excess profits net income fiscal year 1939 | $9,457.49 |
| (b) Increased profits as a result of change in method of distributing beer in San Diego and change in brewmasters, and change in price policy by putting ABC Supreme on the San Diego market at a higher price to the retailer resulting in a higher net profit to petitioner | 114,304.33 |
| (c) Increased profits as a result of change in price policy by putting ABC Supreme beer on the California market and the export market (outside California) at a higher price to the distributors resulting in a higher net profit to petitioner: | |
| (1) California distributors | 23,960.85 |
| (2) Export distributors | 13,164.06 |
| (d) Increased profits as a result of change of method of distributing beer in Los Angeles, Santa Ana, and Glendale | 61,501.07 |
| (e) Increased profits as a result of a change from a liberal credit policy to a strict credit policy | 13,302.71 |
| (f) Change in method of handling bottles in hands of customers to assure their return and eliminate prior losses | 17,712.63 |
| Fiscal year 1939 excess profits net income as reconstructed | 253,403.14 |
| F/Y 1940 excess profits net income assumed at F/Y 1939 level | 253,403.14 |
| F/Y 1938 reconstructed on industry index of net profits (84.62 per cent of $253,403.14) | 214,429.74 |
| F/Y 1937 reconstructed on industry index of net profits (111.79 per cent of $253,403.14) | 283,279.37 |
| Aggregate excess profits net income base period | $1,004,515.39 |
| Constructive average base period net income | $251,128.85 |

A glance at the record of petitioner's operations shows that its earnings greatly depreciated during the base period, particularly for the first 3 years. The evidence indicates, too, that this depreciation was due to conditions affecting petitioner's individual business and not affecting the brewery industry as a whole. For example, while petitioner's sales of beer were falling off at a fairly steady rate from ap-

proximately 178,000 barrels in 1934 to below 100,000 barrels in 1938, 1939, and 1940, the combined sales of all California breweries increased at an equally constant rate from 1,815,750 barrels in 1934 to over 2,216,000 barrels in 1940. In volume of sales, petitioner declined from third place among California breweries in 1934 to ninth place in 1940. Petitioner's heaviest operating loss, $126,291.35, occurred in 1938. At the end of that year, its credit standing was seriously impaired and it was on the verge of bankruptcy. In 1939 there was a turn for the better and a small profit was realized. Earnings then arose to approximately $80,000 in 1940, $147,000 in 1941, and $543,000 in 1942. The fact that petitioner began its recovery during the latter part of the base period and soon thereafter regained its position near the top of the industry and increased its profits approximately to their pre-base period level, indicates that the cause or causes of the reverses were corrected during the base period.

This in itself, however, is not enough to entitle petitioner to relief under section 722 (b) (4). Petitioner must show, in further compliance with the provisions of subsection (b) (4), that in bringing about this improvement in its position it "changed the character of its business," so that "the average base period net income does not reflect normal operations for the entire base period of the business," and, further, that "if such change or changes had taken place 2 years earlier than they did it would have reached a higher earning level by the end of the base period." Only such changes are recognized as qualifying factors under section 722 (b) (4), and, ordinarily, only qualifying factors are to be taken into account in the application of the push-back rule under subsection (b) (4). See *Southern California Edison Co.*, 19 T. C. 935.

The only changes, we think, which, by the most liberal application of the statute, require serious consideration as possible "changes in the character of the business" are the changes in the method of distributing beer in San Diego, Los Angeles, and other areas—a "change in the operation * * * of the business"—and the production of a higher quality beer—a "difference in the products * * * furnished." There was no change in petitioner's management. The duties of the new brewmaster were to work out the formulas for beer and supervise the actual brewing operations. He introduced no innovations in petitioner's plant, either in the way of formula or in the process employed. The business as a whole was at all times under the management and control of Edward P. Baker, who was also president and a director. It was he who, as petitioner states in its brief, was directly responsible for petitioner's success.

Neither do we think that the tightening of the credit policy or the elimination of losses in handling bottles constituted changes in the

character of the business. These were nothing more than the usual precautions incident to the successful operation of a large and complicated business, such as petitioner's. We have no doubt that these changes, along with others described in the evidence, such as the radio advertising program organized in 1938, contributed to petitioner's recovery, but considered in their relationship to petitioner's entire operations, were not changes in the character of the business, within the meaning of the statute.

The "A B C Supreme" beer, referred to above sometimes as petitioner's "new beer," was of the same general type and quality of other premium beers sold by petitioner's competitors, and previously by the petitioner itself, and it was manufactured by substantially the same process. It contained more eastern malt and imported hops than the premium beer previously manufactured by petitioner, and for that reason was considered by some to be of better quality. While it may have been a better product, it was in no sense a new product. Such changes as there were in the formula or in the brewing process were no more than what any manufacturer might normally do to improve the quality and consumer acceptance of its products. It was not like the change in *7–Up Fort Worth*, 8 T. C. 52, where the taxpayer was bottling "7–Up" exclusively and during the base period added a new non-competitive orange drink to its products, or like the addition of the ice-cream mix business in *Lamar Creamery Co.*, 8 T. C. 928.

As to the changes in the distribution of beer, the evidence is that for several years prior to 1938 petitioner's bottled beer was handled in San Diego by a local distributor. Early in 1938 petitioner eliminated the distributor and began delivering bottled beer direct to the retailers. There was no change in the keg beer which at all times had been delivered directly to the retailers. Up until about 1938 or 1939 most of petitioner's San Diego sales were of keg beer. By the end of 1939, however, this situation was reversed and the bottled sales greatly exceeded the keg beer sales. In making this change in San Diego, petitioner increased its local salesmen in that district from two to four and organized a sales campaign, with the result that the number of San Diego retail outlets was increased from 189 in January 1938 to 458 in October 1939.

In 1939 petitioner eliminated its branch offices in Los Angeles, Santa Ana, and Glendale, and established distributors at those points. The Glendale branch office had been opened in 1934 and the Los Angeles in 1935. The Santa Ana office was opened December 15, 1938, and closed January 1, 1939.

Similar shifts in the method of distributing beer were made from time to time in other localities, both before and after the base period years. (See finding 27 above.) Apparently, what petitioner did was

to change from one method of distribution to another whenever the conditions in a locality seemed to warrant it. It established distributors in some areas and eliminated them in others. There was no change in over-all policy or in general operations.

Taken together, all of the changes made by petitioner in his business during the base period years, both those urged as 722 (b) (4) qualifying factors and others, may have been responsible for the reversal of the downward trend in petitioner's earnings and the restoration of its former earning level, but we cannot find that any one of those changes, or all of them taken together, constituted a change in the character of the business, within the meaning of the statute. Such a change, we said in *Avey Drilling Machine Co.*, 16 T. C. 1281, 1298, "must be a substantial departure from the preexisting nature of the business." Here there was no change like the change of a common carrier of freight from an intrastate to interstate carrier as in *East Texas Motor Freight Lines*, 7 T. C. 579. Petitioner's claims for relief under section 722 (b) (4) were, we think, correctly disallowed.

It might be pointed out that petitioner has derived a substantial measure of benefit from the application of the growth formula under section 713 (f). Its base period net income so computed by the respondent was $50,530, as compared with his actual average base period net loss, $12,506.18.

Reviewed by the Special Division as to the 722 issue.

*Decisions will be entered under Rule 50.*