*Decision will be entered under Rule 50.*

JOSEPH WEIDENHOFF, INCORPORATED, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 60793–60796. Filed September 23, 1959.

*Bernard Hoban, Esq.*, for the petitioners.
*Robert E. Johnson, Esq.*, for the respondent.

---

[1] Proceedings of the following petitioners are consolidated herewith: Johnson Fare Box Company, Alleged Transferee, Docket No. 60794; Bowser International, Inc., Docket No. 60795; Bowser, Inc., and its Subsidiaries, Bowser International, Inc., The Briggs Filtration Company, The Eagle Lock Company, The Gudeman Company, Johnson Fare Box Company, Defense Identification Service, Inc., The C. L. Downey Company, The Electrofile Corporation, Visible Cash Controls, Inc., National Scientific Laboratories, Inc., Petinco Systems, Inc., and Joseph Weidenhoff, Incorporated, Docket No. 60796.

OPINION.

Drennen, *Judge:* This consolidated proceeding involves deficiencies in income and excess profits taxes determined against petitioners as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 60793 | Joseph Weidenhoff, Incorporated | 1946 | $16,788.46 |
| 60794 | Johnson Fare Box Company, Alleged Transferee | 1946 | 11,890.58 |
| 60795 | Bowser International, Inc. | 1947 | 344.81 |
| 60796 | Bowser, Inc. and its Subsidiaries, et al | 1951 | [1] 711,316.80 |
|  |  | 1952 | 92,492.36 |

[1] By an amendment to the amended answer, this deficiency determination was increased to $1,105,936.24.

These cases were submitted on a stipulation of all facts under Rule 30. The facts are found as stipulated and the stipulation, together with the exhibits attached thereto, is incorporated herein by reference.

Petitioners are corporations, all members of an affiliated group of which Bowser, Inc., is common parent. For the years 1943 through 1945, and 1948 through 1952, consolidated income and excess profits tax returns were filed for the group by Bowser, Inc.; for 1946 and 1947, the individual affiliates filed separate returns. Petitioners all maintained their books and records and filed their tax returns on an accrual basis of accounting.

A number of issues were raised by the pleadings, but after concessions by both parties there are three basic issues remaining for decision, which are:

(1) Whether in computing operating loss carrybacks and carry-overs under section 122 (b) (1) and (2), I.R.C. 1939,[2] the deduction for accrued excess profits tax, allowed under section 122 (d) (6), is the excess profits tax for the year without reduction for the 10 per cent credit allowed under section 784, and for the deferral in payment allowed under section 710 (a) (5), or whether it is the net amount after such reductions; (2) whether the consolidated returns for Bowser, Inc., and its affiliated group may include and carry forward past 1949 the 1948 and 1949 operating losses of the Fostoria Screw Company, an affiliate, which had in 1949 ceased production and sold its operating assets;[3] and (3) whether Regulations 129, section 24.31 (b) (24), is applicable to limit the amount of the affiliated group's consolidated excess profits credit for the years 1951 and 1952. The first issue is common to three dockets, Nos. 60793, 60794, and 60796; the other two issues involve only Docket No. 60796. Docket No. 60795 will not require separate consideration as the issue raised there-

[2] All section references are to the Internal Revenue Code of 1939, as amended.

[3] This issue was raised by respondent by amendment to answer, and respondent recognizes on brief that he has the burden of proof on this issue.

in is a matter of computation which may be settled under Rule 50 on the basis of our resolution of the primary issues.

Respondent has, on brief, conceded the "tax benefit" issue raised by the pleadings in Docket Nos. 60793, 60794, and 60796. Petitioners have on reply brief conceded two other issues joined in the pleadings in Docket Nos. 60794 and 60796 involving (1) the carryover of a 1948 net operating loss of Briggs Filtration Company in determining the 1950 consolidated income of the Bowser, Inc., affiliated group; and (2) the liability of Johnson Fare Box Company as transferee for the 1946 income tax liability of Johnson Consumer Industries, Inc., if any. Petitioners did not argue on brief the issue of whether Bowser, Inc., is entitled to a loss in the year 1949 or 1952 on its investment in the stock of the Fostoria Screw Company, but take the position in their reply brief that respondent's disallowance of the investment loss can result only through allowance of the operating loss of Fostoria for the years 1948 and 1949 to the affiliated group for subsequent years. Under the provisions of the consolidated Regulations 129, section 34.34, it would reduce the investment cost to zero if the operating losses are allowed.

Inasmuch as the parties are agreed on all essential facts, the details of which are complex, we will recite herein only the facts we deem essential to a conclusion of the remaining legal issues involved. The amounts to be entered as our decision can be computed by the parties from the stipulated facts under Rule 50.

## Issue 1.

The first issue is whether an accrual basis taxpayer in computing the amount of 1947 net operating loss available for carryback to 1946 or carryover to subsequent years may deduct from 1945 net income the gross amount of the excess profits tax computed for the year 1945, or may deduct only the gross amount of tax less (a) the 10 per cent credit provided in section 784,[4] and less (b) the deferral in payment provided in section 710(a)(5)[5] of the Code. In other words, is

---

[4] SEC. 784. TEN PER CENTUM CREDIT AGAINST EXCESS PROFITS TAX.

(a) ALLOWANCE.—Against the tax imposed by this subchapter for any taxable year beginning after December 31, 1943, there shall be allowed as a credit an amount equal to 10 per centum of such tax.

[5] SEC. 710. IMPOSITION OF TAX.

(a) IMPOSITION.—

* * * * * * *

(5) DEFERMENT OF PAYMENT IN CASE OF ABNORMALITY.—If the adjusted excess profits net income (computed without reference to section 722) for the taxable year of a taxpayer which claims on its return, in accordance with regulations prescribed by the Commissioner with the approval of the Secretary, the benefits of section 722, is in excess of 50 per centum of its normal tax net income for such year, computed without the credit provided in section 26(e) (relating to adjusted excess profits net income), the amount of tax payable at the time prescribed for payment may be reduced by an amount equal to 33 per centum of the amount of the reduction in the tax so claimed. For the purposes of section 271, if the tax payable is the tax so reduced, the tax so reduced shall be considered the amount shown on the return. Not-

the deduction allowed by section 122(d)(6)[6] the excess profits tax for the year before allowance of the credit and the deferral in payment provided where section 722 relief is claimed, or is it the excess profits tax actually shown to be due and payable on the return as of the end of the year 1945, after reduction thereof by the credit and the deferral above mentioned?

Joseph Weidenhoff, Incorporated, an Illinois corporation with principal office at Algona, Iowa, filed its separate income tax return for the calendar year 1946 with the former collector of internal revenue for the first district of Illinois.

In 1946, the corporation had net income of $318,795.57 before net operating loss deduction, and in 1947 a net operating loss of $187,564.74 before net operating loss deduction.

For the purpose of applying the net operating loss carryback and carryover provisions of section 122, the amount of excess profits tax accrued on December 31, 1945, before credit under section 784, was $79,300.27. The 10 per cent credit provided by section 784 was $7,930.03.

Johnson Fare Box Company, a Delaware corporation with principal office in Chicago, Illinois, is the transferee of the 1946 income tax liability of its subsidiary Johnson Consumer Industries, Inc., which in 1948 was merged into its parent. (Petitioner no longer contests its liability as transferee.) Johnson Consumer Industries, Inc., was a Delaware corporation with principal office in Maspeth, Long Island, New York, and filed its 1946 income tax return with the former collector of internal revenue for the first district of New York.

Johnson Consumer Industries, Inc., had net income for 1946 of $101,934.65 before net operating loss deduction, and for 1947 had a net operating loss of $65,541.65 before net operating loss deduction.

For the purpose of applying the provisions of section 122, the excess profits tax of Johnson Consumer Industries, Inc., accrued on December 31, 1945, before credit under section 784, was $5,832.98; the credit was $583.30.

---

withstanding any other provision of law or rule of law, to the extent that any amount of tax remaining unpaid pursuant to this paragraph is in excess of the reduction in tax finally determined under section 722, such excess may be assessed at any time before the expiration of one year after such final determination.

[6] SEC. 122. NET OPERATING LOSS DEDUCTION.

(a) DEFINITION OF NET OPERATING LOSS.—As used in this section, the term "net operating loss" means the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d).

\* \* \* \* \* \* \*

(d) EXCEPTIONS, ADDITIONS, AND LIMITATIONS.—The exceptions, additions, and limitations referred to in subsections (a), (b), and (c) shall be as follows:

\* \* \* \* \* \* \*

(6) There shall be allowed as a deduction the amount of tax imposed by Subchapter E of Chapter 2 paid or accrued within the taxable year, subject to the following rules—

32 T.C.

The Fostoria Screw Company, an Ohio corporation with principal office at Fostoria, Ohio, filed its separate income tax return for the calendar year 1946 with the former collector of internal revenue at Toledo, Ohio.

The corporation sustained a net operating loss of $296,907.71 in 1946, and in 1947 had a net income of $165,989.70.

For the purpose of applying the provisions of section 122, the excess profits tax of the Fostoria Screw Company accrued on December 31, 1945, before credit under section 784, was $193,957.22; the credit was $19,395.72.

Bowser, Inc., an Indiana corporation with principal office at Fort Wayne, Indiana, filed as common parent of an affiliated group consolidated income and excess profits tax returns for the calendar years 1943–1945 and 1948–1952 with the former collector of internal revenue for the district of Indiana. In 1946 and 1947, the 2 years in which each member of the affiliated group filed separate returns, Bowser, Inc., itself had, before net operating loss deduction, a loss of $1,522,017.77 and an income of $568,218.75, respectively. The following year, 1948, with the resumption of consolidated reporting, the group sustained a consolidated net operating loss of $1,316,733.92 before net operating loss deduction.

For the purpose of determining the net operating loss carryover from 1946 to years 1947 and 1948, which in turn is determined by the loss carryback from 1947 through 1945 to 1946, the amount of excess profits tax accrued as of December 31, 1945, for the affiliated group, with the deferral in payment and credits as noted, is as follows:

| | 1945 excess profits tax accruals before credit under sec. 784 and before deferral in payment under sec. 710(a)(5), I.R.C. 1939 | Deferral in payment under sec. 710(a)(5), I.R.C. 1939 | Credit under sec. 784, I.R.C. 1939 |
|---|---|---|---|
| Bowser, Inc. | $2,676,412.10 | $92,864.27 | $258,354.78 |
| The Fostoria Screw Company | 193,957.22 | (1) | 19,395.72 |
| The Eagle Lock Company | (1) | (1) | (1) |
| Johnson Fare Box Company | (1) | (1) | (1) |
| Joseph Weidenhoff, Incorporated | 79,300.27 | (1) | 7,930.03 |
| Johnson Consumer Industries, Inc. | 5,832.98 | (1) | 583.30 |
| Consolidated excess profits tax accrued for the affiliated group | 2,955,502.57 | 92,864.27 | 286,263.83 |

1 None.

The parties settled by agreement the tax liabilities of the corporations involved for the year 1945, and we are not here concerned with the tax liabilities for that year. However, in determining how much of the 1947 operating losses of the corporations is available for carry-

back to the year 1946 and carryover to subsequent years, we must reduce the 1947 operating loss carryback by the amount thereof that would be applied to the year 1945, the second taxable year preceding the year of loss. This record does not show whether the 10 per cent credit and the deferral in payment were taken into consideration in the settlement of the 1945 tax, and as we understand the law as interpreted by various courts, this would make no difference in any event. The parties have stipulated the amount of excess profits tax accrued at December 31, 1945, determined in accord with the normal accounting concepts relevant to the accrual basis, prior to the deferral in payment under section 710(a)(5) and the credit under section 784, and they have also stipulated the amounts of the deferrals and credits.

The parties agree that the amount of the 1947 net operating loss carryback that would be absorbed in 1945 is decreased by the excess profits tax properly accrued as of December 31, 1945. Petitioners claim that the gross amount of the 1945 tax is the figure to be used, thereby leaving a larger amount of the 1947 loss to be carried back to 1946 or carried forward to subsequent years; whereas respondent claims the tax properly accruable as of December 31, 1945, is the tax computed on the 1945 net income reduced by the deferrals and credits, thereby absorbing a greater amount of the 1947 loss against the year 1945, which year has been closed by settlement.

This issue is a further refinement of the questions decided by the Supreme Court in *United States* v. *Olympic Radio & Television*, 349 U.S. 232, and *Lewyt Corp.* v. *Commissioner*, 349 U.S. 237, and by this Court in *California Vegetable Concentrates, Inc.*, 10 T.C. 1158, and *F. L. Jacobs Co.*, 30 T.C. 1194. While those cases do not decide the points here in issue, we believe the reasoning employed in those opinions logically directs the conclusion we reach here.

So far as here pertinent, section 23(s) provides that there may be deducted from gross income a net operating loss deduction computed under section 122. Section 122(a) defines the term "net operating loss" as the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d). Section 122(b)(1) provides that if a taxpayer has a net operating loss for a taxable year, such net operating loss shall be a net operating loss carryback for each of the 2 preceding taxable years, except that the carryback in the case of the first preceding taxable year shall be the excess, if any, of the amount of such net operating loss over the net income of the second preceding taxable year computed with the exceptions, additions, and limitations provided in subsection (d)(6). Section 122(d)(6) provides that there shall be allowed as a deduction "the amount of tax imposed by Subchapter

E of Chapter 2 paid or accrued within the taxable year," subject to certain rules not here important. Subchapter E of chapter 2 imposed the World War II excess profits tax effective for the years 1940 through 1945. Part I of subchapter E, section 710(a), imposed the tax, and section 710(a)(5) provided that if the adjusted excess profits net income for the taxable year of a taxpayer which claims on its return the benefits of section 722 is in excess of 50 per cent of its normal tax income for the year, the amount of tax payable at the time prescribed for payment may be reduced by an amount equal to 33 per cent of the amount of the reduction in the tax so claimed. It also provided that any unpaid tax remaining after the section 722 issue is finally determined may be assessed within 1 year after such final determination. The excess profits tax return for 1945 of Bowser, Inc., and its affiliates claimed a deferral of $92,864.27 under section 710(a)(5).

Part III of subchapter E, as originally enacted, provided for a postwar refund of 10 per cent of the tax imposed by this subchapter for the years 1942 and 1943. This was accomplished under section 780 by means of establishing a credit to the account of the taxpayer and the issuance of bonds to the taxpayer in the amount of the credit after the tax was paid, which bonds were to mature after the cessation of hostilities. However, for years beginning after 1943, section 784, enacted in 1945, provided for the allowance of a credit directly against the tax, equal to 10 per cent of the amount of the tax, and the excess profits tax return for the year 1945 provided for deduction of the credit in computing the excess profits tax due. A taxpayer claiming the credit for 1945 was not required to pay the amount of the credit at the time the return was filed.

In *United States* v. *Olympic Radio & Television*, *supra*, the Supreme Court held that for an accrual basis taxpayer, the deduction of excess profits tax allowed under section 122(d)(6) is the tax that accrues for that particular year rather than the excess profits tax for a preceding year that might have been paid during the particular year.

In a companion case, *Lewyt Corp.* v. *Commissioner*, *supra*, an additional issue was raised, being whether the amount of the 1946 operating loss absorbed by carryback to 1944 was the net income for 1944 less the excess profits tax originally shown to be due on the 1944 return (properly adjusted for errors), or was the net income for 1944 less only the excess profits tax for that year ultimately found to be due after adjustments for renegotiation and carrybacks or for other events occurring subsequent to the close of the taxable year. The Court held that the deduction allowed by section 122(d)(6) was the excess profits tax originally shown to be due, unreduced by events occurring after the year 1944. The Court reasoned that the language

"the amount of tax *imposed* by Subchapter E of Chapter 2" simply identified the tax for which the deduction is allowed, and that the words "*accrued* within the taxable year" were the critical words in determining the amount of the deduction; and since the tax accrued by an accrual basis taxpayer is determined in accord with the normal accounting concepts relevant to the accrual basis from known events as of the end of the year, the tax properly computed on the accrual basis is the tax which may be deducted under section 122(d)(6). (Emphasis added.) "Events and transactions of later years, irrelevant to a determination of income on the accrual basis do not warrant alteration of the figure computed under § 122(d)(6) for the year in question." *Lewyt Corp.* v. *Commissioner, supra*, at 243.

Based on the decision in the *Lewyt* case, this Court held in *F. L. Jacobs Co., supra*, that in carrying back a 1946 net operating loss to the year 1945, the computation required by section 122(b)(1) involves the use of the 1944 *net income* figure after renegotiation and accelerated amortization adjustments but the *excess profits tax* figure for 1944 computed *before* such adjustments are given effect.

Applying the rule of the above cases to this case, the amount of excess profits tax for the year 1945, which may be deducted from the 1945 net income in computing the amount of carryback of 1947 net operating losses to the year 1946, is the amount of excess profits tax properly accruable as of the end of the year 1945. But we must also determine whether the excess profits tax properly accrued as of the end of 1945 was the tax as computed before the credit allowed under section 784 and the deferral allowed under section 710(a)(5).

This Court held in *California Vegetable Concentrates, Inc., supra*, that the 33 per cent deferral allowed under section 710(a)(5) is not a part of the tax imposed within the language of section 271, defining a deficiency, because the 33 per cent deferral is not imposed, if ever, until final determination under section 722 that the taxpayer is liable therefor. We found that Congress did not intend that a taxpayer should be liable for the 33 per cent deferral until completion of the section 722 procedure. While it is true that the Supreme Court in the *Lewyt* case emphasized the word "accrued" in section 122(d)(6) rather than the word "imposed," whereas the opinion of this Court in *California Vegetable Concentrates, Inc., supra*, relied primarily on the word "imposed," we think it is clear that if the amount of the deferral is not a part of the tax imposed under subchapter E of chapter 2, it could not be a tax accrued under that subchapter as of the end of the taxable year. Furthermore, we do not think the gross amount of the excess profits tax computed before the deferral is a proper accrual within the normal accounting concepts relevant to an accrual basis, because liability for the deferred amount, by virtue of

the claim on the return itself, was contested by the taxpayer and could not become fixed until settlement of the section 722 claim, or events occurring subsequent to the end of the taxable year. *Security Mills Co.* v. *Commissioner*, 321 U.S. 281. Petitioners' argument that the tax imposed by subchapter E is the gross amount of the tax and that the question we must decide is whether the deferral allowed under section 710(a)(5), since it simply allows a deferral in payment of the tax, is a properly accruable deduction in the year 1945, loses its weight in the light of our decision in *California Vegetable Concentrates, Inc., supra,* that the deferred amount is not a part of the tax imposed, and the Supreme Court opinion in the *Lewyt* case holding that the basic question is the amount of the tax properly accrued as of the end of the year.

This Court also had before it in *California Vegetable Concentrates, Inc., supra,* the question whether the credit for postwar refunds of excess profits tax, provided by sections 780 and 781, should be deducted in computing the amount of a deficiency in excess profits tax. This same question was indirectly involved in *United States* v. *Arthur G. McKee & Company,* 139 F. Supp. 263 (N.D. Ohio). Both courts held in effect that the credit allowed under section 780 did not reduce the excess profits tax liability of the taxpayer for the taxable year with the result that the proper amount of excess profits tax accrued as of the end of the year would be the gross amount of the tax without reduction by the credit. However, both courts based their decisions on the mechanics employed by Congress in allowing this credit under sections 780 and 781 for the years 1942 and 1943.

But we are here concerned with the 10 per cent credit allowed for the year 1945 under section 784. Unlike sections 780 and 781, which required the taxpayer to pay 100 per cent of the excess profits tax but provided a credit to his account which was to be refunded after cessation of hostilities, section 784, applicable to the year 1945, allows a direct credit against the tax imposed by the subchapter in an amount equal to 10 per cent of such tax. The taxpayer is not required to pay the tax at that time or at any future date. He never has any liability for the amount of the credit because the credit is always available in the amount of 10 per cent of the tax imposed, whatever that may be. If any part of the 10 per cent credit deducted on the excess profits tax return for the year ever has to be paid, it would in most cases result only from events occurring after the close of the taxable year. The reasoning used by this Court and by the District Court in determining that the postwar refund credit provided by section 780 was not deductible from tax liability accrued as of the end of the year, as well as the reasoning of the Supreme Court in the *Lewyt* case, we feel requires the conclusion here that the 10 per cent credit allowed under section 784 should be deducted first

in determining the amount of excess profits tax accrued as of the end of 1945.

We hold that in determining the amount of the deduction against 1945 net income allowed under section 122(d)(6), the excess profits tax accrued for the year 1945 is the amount stipulated by the parties as set out above, less the deferral in payment under section 710(a)(5) and less the credits under section 784.

*Issue 2.*

The second issue is whether Bowser, Inc., and its affiliates are entitled to carry forward in their consolidated income tax returns for the years 1950 and 1951 the operating losses of the Fostoria Screw Company for the years 1948 and 1949.

Bowser, Inc., acquired all of Fostoria's capital stock in 1941, at a cost of $400,000, which it has continuously owned through the years involved.

According to its articles of incorporation, as amended, Fostoria's business purpose was "manufacturing and dealing in steel, iron, brass, bronze, copper, aluminum, and kindred metal, nuts, screws, bolts and specialties." It maintained its separate records and corporate minute books throughout the years of its existence and at least to July 16, 1952.

At a special meeting of its stockholders and directors held on September 12, 1949, an agreement to sell the assets of Fostoria was accepted and the officers and directors of the corporation were authorized and directed to sell the assets of the corporation for cash to the other parties to the agreement. Pursuant to such authorization, all of the operating assets of Fostoria were sold for cash to interests unconnected with the Bowser group, and Fostoria terminated its business operations as of that date.

At a special meeting of the stockholders of Fostoria held on July 16, 1952, a resolution to dissolve the corporation was adopted and pursuant thereto, on July 31, 1952, a certificate of dissolution of the corporation was filed with the secretary of state of Ohio. Franchise taxes were paid to the State of Ohio for Fostoria in the years 1950 and 1951.

Shortly after the sale of its operating assets, the books of the company were transferred from Fostoria, Ohio, to Fort Wayne, Indiana, the principal office of Bowser, Inc., and the collector of internal revenue at Toledo, Ohio, was advised that tax returns for Fostoria would henceforth be filed at Indianapolis. Neither the stockholders nor directors of Fostoria held any meetings between November 7, 1949, and July 16, 1952. Fostoria's remaining assets as of December 31, 1949, consisted of cash, accounts receivable,

and an income tax refund receivable; as of December 31, 1950, accounts receivable and the carryover tax refund receivable; and as of December 31, 1951, only the tax refund receivable. The company, during the course of these years, also had several claims pending against the Federal Government for renegotiation rebates and income and excess profits tax refunds.

During the period following the sale of its operating assets in 1949 and until its dissolution in 1952, the principal activities of Fostoria consisted of the receipt of 13 invoices issued by Bowser, Inc., primarily for collection services; the maintenance by a Bowser, Inc., auditor of two bookkeeping documents for Fostoria designated "Home Office Account" and "Journal Entries 1951," and preparation by him of a handwritten trial balance sheet for 1949, 1950, and 1951; the execution of consent agreements with the collector of internal revenue for extensions of periods of limitations for assessment of tax; and participation in various court proceedings in this Court and the Court of Claims. In 1955, a refund of taxes in the amount of $21,640.40, less a previous allowance of $13,859.73, and interest in the amount of $5,208.82 was allowed Fostoria by the collector of internal revenue.

Starting in 1944 and continuously thereafter until at least September 8, 1949, Bowser, Inc., loaned money to Fostoria on notes and open account. During 1948 and 1949, Bowser, Inc., loaned Fostoria a total of $374,500 on demand interest-bearing notes, all of which were paid off in full on October 19, 1949.

In 1946, Bowser, Inc., sold $5 million of its preferred stock, and the registration statement filed with the Securities and Exchange Commission listed the assets of Fostoria as a part of the plant and properties of the company and its subsidiaries.

During the years 1947 to 1953, inclusive, stock of Bowser, Inc., was held by more than 4,000 stockholders and was traded "over the counter" by brokers in most of the major cities of the United States.

In 1948 and 1949, Fostoria had operating losses, before net operating loss deductions, of $315,540.45 and $584,961.96, respectively, which were included in the consolidated income tax returns filed by Bowser, Inc., for the affiliated group for those years, which consolidated returns reported consolidated losses, before net operating loss deductions, of $1,438,400.06 in 1948 and $2,248,754.22 in 1949. These consolidated losses, including the losses of Fostoria, were carried over and claimed as deductions in the consolidated returns for the affiliated group for subsequent years, including the years here involved.

The consolidated income tax returns filed for the affiliated group by Bowser, Inc., showed income, before net operating loss deduction, of $1,024,048.40 for the year 1950; of $1,886,845.12 for the year 1951; and of $964,230.20 for the year 1952. These returns did not show any operating income for Fostoria.

The operating losses of Fostoria for 1948 and 1949 were included in the decrease of consolidated earned surplus of the affiliated group.

In his notice of deficiency respondent did not eliminate Fostoria's operating losses for the years 1948 and 1949 from the consolidated operating loss carryovers of the affiliated group to the years 1950 and 1951, but allowed them as claimed in the consolidated return filed for the group.

This issue was raised by respondent by an amendment to his amended answer wherein he alleged that the affiliated group was not entitled under any section of the 1939 Code or regulations thereunder to carry forward past the year 1949 any net operating loss of the liquidated subsidiary, Fostoria, for the years 1948 and 1949, because (a) Fostoria was not a member of the affiliated group after 1949, (b) it ceased to do business in 1949, (c) the affiliated group did not carry on the former business of Fostoria after 1949, and (d) there was no continuity of business thereafter which would permit the affiliated group to carry over the net operating loss of Fostoria.

Petitioners claim that by statutory definition Fostoria was a member of the affiliated group in all years from 1948 to 1952, inclusive, and that respondent's regulations, issued pursuant to statute, require that Fostoria's losses be included in the consolidated net operating loss for years in which it was included in the consolidated return. Petitioners also claim that the affirmative allegations in the amendment to the amended answer are immaterial to the adjudication of this issue and, furthermore, that respondent has not proved these allegations.

On brief respondent does not mention his consolidated return regulations and to all intents and purposes ignores the fact that consolidated returns were filed for the affiliated group, with Fostoria included, for each of the years 1948 to 1952, inclusive. Instead, respondent argues primarily that the carryover privilege is not available to the affiliated group unless there is a continuity of the business enterprise which incurred the loss, and secondarily, that Fostoria was not a member of the affiliated group after 1949 because it was de facto dissolved in 1949.

Unquestionably, Fostoria, at least until it was formally dissolved in August 1952, came within the statutory definition of an includible corporation within an affiliated group. The sole test of what is a member of an affiliated group is statutory; and the only requirement is the requisite stock ownership. Sec. 141 (d) and (e), I.R.C.; Regs. 129, sec. 24.2 (b) ; *Burnet* v. *Aluminum Goods Co.*, 287 U.S. 544; *Autosales Corporation* v. *Commissioner*, 43 F. 2d 931 (C.A. 2) ; *Utica Knitting Co.* v. *United States*, 68 Ct. Cl. 77; *Hancock Construction Co., et al.*, 11 B.T.A. 800.

Unless the sale of its operating assets in 1949 and its cessation of operations, or its lack of income, relieved it of doing so, Fostoria was

required to file a return for the years 1950, 1951, and 1952. Sec. 52, I.R.C.; Regs. 111, sec. 29.52–1. Having joined in the consolidated returns of the affiliated group for the years 1948 and 1949, Fostoria, if it was required to file a return at all, was required to join in the consolidated returns filed for the affiliated group in 1950, 1951, and 1952 as long as it remained a member of the group, and it did so. Sec. 141(a), I.R.C.; Regs. 129, sec. 24.11. And under Regulations 129, section 24.31(a), the consolidated net operating loss deduction for the affiliated group must be computed by combining the net operating losses of the several affiliated corporations having net operating losses, including carryovers and carrybacks.

So under the consolidated return regulations, Fostoria's operating losses for 1948 and 1949 were includible in the net operating loss deduction of the affiliated group for the years 1950 and 1951 unless respondent can show that Fostoria was not a member of the affiliated group, within the meaning of the regulations, after 1949. And if Fostoria's losses were includible in the losses of the affiliated group under the regulations, they are deductible under the law unless to do so would not clearly reflect the income and excess profits tax liability of the group and each corporation in the group. Sec. 141(a), I.R.C.

We turn first to respondent's contention that Fostoria was not in existence as a member of the affiliated group after 1949 because it was de facto dissolved in 1949. For support of this contention, respondent relies on *Winter & Co. (Indiana)*, 13 T.C. 108, and *A B C Brewing Corp.*, 20 T.C. 515, affd. 224 F. 2d 483 (C.A. 9), each of which cases dealt with the carryback of an unused excess profits credit accruing after the corporation had ceased operations. On the other hand, petitioners cite *United States* v. *Kingman*, 170 F. 2d 408 (C.A. 5), *Allegheny Broadcasting Corporation*, 12 T.C. 552, affd. 179 F. 2d 844 (C.A. 3), and *Union Bus Terminal, Inc.*, 12 T.C. 197, affirmed per curiam 179 F. 2d 399 (C.A. 5), in support of its claim that there was no de facto dissolution of Fostoria in 1949. Each of these cases involves the question of whether the corporate taxpayer had a short taxable year ending at the time it ceased operations, within the meaning of the statutory provision requiring annualization of income and proration of credits where a corporation has a taxable year less than 12 months. A comparison of cases cited by each party makes it apparent that in considering whether a corporation is de facto dissolved before it is legally dissolved, the courts have looked not only to the facts of each individual case but also to the different provisions of the tax law under consideration and the underlying purpose of Congress in enacting the various provisions. Therefore, inasmuch as none of the above cases is concerned with operating loss

carryovers and carrybacks and consolidated returns, we do not consider any of them conclusive of the issue before us.

The case most directly in point cited to us appears to be *Hancock Construction Co., et al., supra,* wherein this Court held that where a corporation, a member of an affiliated group, filed a consolidated return for the year 1919, transferred all of its assets to its mortgagee in 1919, and was completely inactive and without income in 1920, nevertheless, its share of the consolidated net operating loss of the affiliated group for the year 1919 could be carried over and used as a deduction against the consolidated net income of the other members of the affiliated group for the year 1920.

In a later decision of this Court, not involving, however, consolidated returns, *Acampo Winery & Distilleries, Inc.,* 7 T.C. 629, we held that a corporation which filed a voluntary consent to dissolve in February 1943 and transferred substantially all of its assets to trustees for its stockholders, retaining a few assets to pay some commitments, taxes, and expenses of winding up, and then ceased doing business but proceeded to wind up its affairs in complete liquidation and dissolution, was entitled to an operating loss carryback from the years 1944 and 1945 to the year 1943. The Court based its conclusion on the absence of anything in the statute or regulations to show that the corporation was not entitled to the deduction, stating that the words of the statute are general in their application and something would have to be read into them which is not there to limit them so they would not apply in that case.

A distinction between the application of the de facto dissolution theory to excess profits credit carryback cases and operating loss carryover and carryback cases was also pointed out in *Wier Long Leaf Lumber Co.,* 9 T.C. 990, affirmed in part and reversed in part 173 F. 2d 549 (C.A. 5), and in *Gorman Lumber Sales Co.,* 12 T.C. 1184. In the *Wier* case, this Court distinguished the intent and purpose of Congress in allowing operating loss carrybacks and excess profits credit carrybacks, holding that the former are allowable during the period of liquidation of a corporation incurring the loss, while the latter are not allowable during such period. On appeal, the Court of Appeals disagreed with the theory of this Court that in the case of excess profits credit carrybacks a credit could never be obtained after a corporation ceased operations, and held that the credit was available during that period of corporate liquidation in which the continued existence of the corporation was necessary. However, the Court of Appeals said nothing about operating loss deductions.

In the case before us, the evidence indicates only that Fostoria sold its operating assets in 1949 and ceased operations. No resolution to dissolve was adopted prior to 1952, and there is no evidence

regarding the intent of the officers, directors, and stockholders of the corporation with respect to the future of the corporation until its ultimate dissolution in 1952. See *Hancock Construction Co., et al., supra.* The evidence does indicate that there was very little activity on the part of the corporation, subsequent to the year 1949, other than in collecting debts and engaging in court proceedings with respect to its income taxes, but the evidence also shows that the corporation had assets in the form of bank accounts, accounts receivable, and income tax receivable, and claims against the United States for renegotiation rebates, income, and excess profits tax refunds. Fostoria was also indebted to its parent, Bowser, Inc., which indebtedness was curtailed during this period by applying thereon amounts collected on accounts receivable and tax refunds. All of the evidence before us indicates at best that the corporation was in the process of an orderly liquidation of its affairs during 1950 and 1951, although it would have been entirely possible at any time prior to adoption of the resolution of dissolution in 1952 for the corporation to have again become active.

On the record before us, we cannot find that Fostoria ceased to exist as a member of the affiliated group prior to its dissolution in 1952. Respondent's reliance on the Ohio Code, sec. 8623–80 (Throckmorton), which provides in part that on filing a certificate of voluntary dissolution, a corporation shall cease to carry on its business and shall be without authority to do so but shall continue for the sole purpose of settling its affairs, is misplaced because as we read that section of the Ohio Code, it applies only after a certificate of dissolution has been filed, which was not done in this case until 1952. We hold that Fostoria was not de facto dissolved in 1949 or at any time prior to July 31, 1952, when it filed a certificate of dissolution with the secretary of state of Ohio, for the purpose of applying the consolidated net operating loss deduction provisions of the Internal Revenue Code and the regulations.

In the absence of a de facto dissolution of Fostoria, it seems clear that under the statutory provisions and respondent's own regulations, as pointed out above, Fostoria's portion of the 1948 and 1949 consolidated net operating losses not only may be, but probably must be included in the computation of the consolidated net operating loss deduction of the affiliated group for the years 1950 and 1951, unless to do so would avoid the tax liability intended to be imposed on an affiliated group by Congress.

Respondent does not suggest that Fostoria was not required to file income tax returns for the years 1950, 1951, and 1952, nor does he suggest how Fostoria could have done other than join in the consolidated return filed by the affiliated group, it having joined in consolidated returns filed for the previous years. Rather, respondent

claims that *Libson Shops, Inc.* v. *Koehler*, 353 U.S. 382, and *Mill Ridge Coal Co.* v. *Patterson*, an unreported case (N.D. Ala., 1958; 1 A.F.T.R. 2d 1627, 58–1 U.S.T.C. par. 9489), affd. 264 F. 2d 713 (C.A. 5), require the conclusion that Fostoria's portion of the consolidated net operating losses for 1948 and 1949 cannot be carried over beyond the year 1949, after which the former business of Fostoria was no longer continued by any member of the affiliated group.

We do not agree with respondent that the *Libson Shops* case requires the denial of the deduction here under consideration. On the contrary, we believe the opinion implies at least that a net operating loss incurred by a member of an affiliated group during a consolidated return period will be allowed as a carryover against the operating income of other members of the affiliated group in a succeeding consolidated return year. In *Libson Shops*, the Supreme Court specifically points out that in that case the 16 sales corporations, prior to the merger, chose to file separate income tax returns rather than to pool their income and losses by filing a consolidated return, thus implying that had the corporations filed consolidated returns prior to the merger, the premerger losses of the three loss companies could have been included in a net operating loss carryover to the continuing corporation after the merger. We also believe that the intent and purpose of Congress in enacting the loss carryover provisions, as discussed by the Supreme Court in *Libson Shops*, are carried out by allowing the deduction claimed here. The businesses which suffered the 1948 and 1949 losses were the businesses of the affiliated group, and Bowser, Inc., which owned all of the stock of Fostoria, was the taxpayer which suffered the actual economic loss. Furthermore, there is no claim or evidence of any tax avoidance scheme here, and there can be no claim that the affiliated group has acquired a deduction which it would not have been entitled to had Fostoria not sold its operating assets, as was the basis of the Supreme Court decision in the *Libson Shops* case and was also the basis of the decision of the Fifth Circuit Court of Appeals in denying the operating loss deduction in *Mill Ridge Coal Co.* v. *Patterson*, *supra*.

We conclude that Fostoria's pro rata share of the consolidated net operating losses of the affiliated group for the years 1948 and 1949 should be included in the computation of the consolidated net operating loss deduction of the affiliated group for the years 1950 and 1951.

### *Issue 3.*

The third issue remaining for decision is whether respondent erred in computing the consolidated excess profits credit of the affiliated group for the years 1950, 1951, and 1952. The affiliated group, which became such after March 14, 1941, computed its excess profits credit based on invested capital.

## 1238

This issue involves two points:

(1) In computing net assets for consolidated equity capital purposes, respondent subtracted the investment of some of the members of the affiliated group in stock of other members of the affiliated group from the balance sheet of the corporation whose stock was owned by another. Petitioners assert that under consolidated Regulations 129, section 24.31(b) (2) (xiii),[7] the investment in stock of another member of the affiliated group should be subtracted from the balance sheet of the corporation that made the investment and which owns the stock. Respondent does not argue this point on brief.

In computing net assets for consolidated equity capital purposes, adjustments are necessary so that investments and assets are not duplicated in the consolidated total. In Regulations 129, section 24.31(b) (2) (xiii), respondent directs the method of adjusting separate balance sheets for the computation of total assets. We think it is clear that subparagraph (a) of this section provides for the adjustment that is to be made to the balance sheet of the *stockholding corporation*, which is that the corporation owning stock of another member of the affiliated group must eliminate from *its* assets for purposes of computing equity invested capital its adjusted basis in the stock of the other corporation. It is equally clear that subparagraph (b) of this section directs the method of adjusting the balance sheet of the corporation whose stock is owned by another member of the affiliated group and that this section makes no provision for deducting the cost of its stock to another corporation from its balance sheet. We also think it is clear that the method directed by these two subparagraphs of this section of the regulations is consonant with the objective of eliminating duplication of assets in the affiliated group.

---

[7] Regs. 129.
SEC. 24.31. BASES OF TAX COMPUTATION.
(b) COMPUTATIONS.—In the case of affiliated corporations which make, or are required to make, a consolidated return, and except as otherwise provided in these regulations—

\* \* \* \* \* \* \*

(2) Other computations on separate basis. The various other computations required by these regulations to be made by the several affiliated corporations shall be made in the case of each such corporation in the same manner and under the same conditions as if a separate return were to be filed, but with the following exceptions:

\* \* \* \* \* \* \*

(xiii) Total assets for equity capital purposes. In the computation of the total assets for consolidated equity capital purposes, the following rules shall apply:

(a) In the case of a corporation owning stock of another member of the affiliated group, there shall be subtracted an amount equal to the adjusted basis of such stock for determining gain.

(b) In the case of a corporation the stock of which is held by other members of the group with a basis for equity capital purposes determined to be a cost basis, the adjusted basis of its assets attributable to the stock so held on the date on which such corporation became a member of the group (whether such date falls before, on, or after July 1, 1950, and whether such date falls within a consolidated or separate return period) shall be determined as if, on such date, the adjusted basis of its assets were equal to the fair market value of such assets as of such date. \* \* \*

We find no authority in the regulations or elsewhere to support respondent's method of eliminating the investment in stock of other members of the affiliated group, and we hold for petitioner on this point.

(2) The second and more difficult point under this issue is whether consolidated Regulations 129, section 24.31(b)(24),[8] is (a) applicable

8 Regs. 129.
SEC. 24.31. BASES OF TAX COMPUTATION.
(b) COMPUTATIONS.—In the case of affiliated corporations which make, or are required to make, a consolidated return, and except as otherwise provided in these regulations—
* * * * * * *
(24) Qualifications on excess profits credit where group membership changed after March 14, 1941. In the case of an affiliated group formed at any time subsequent to March 14, 1941, or having among its members one or more subsidiaries which became members of the group subsequent to March 14, 1941, the consolidated excess profits credits for the taxable year shall be determined subject to the following qualifications:
(i) The portion of the consolidated excess profits credit otherwise allowable with respect to the common parent corporation and with respect to any subsidiaries which were members of the group on March 14, 1941, shall not exceed—
(a) The portion of the consolidated section 433(a) excess profits net income for the taxable year attributable to such common parent corporation, in the case of a group formed subsequent to March 14, 1941, or
* * * * * * *
(ii) The portion of the consolidated excess profits credit otherwise allowable with respect to a subsidiary corporation which became a member of the group subsequent to March 14, 1941, shall not exceed—
(a) The portion of the consolidated section 433(a) excess profits net income for the taxable year attributable to such subsidiary corporation in the case in which such subsidiary corporation was not on March 14, 1941, a member of an affiliated group within the meaning of section 141, or
* * * * * * *
(iii) The portion of the consolidated excess profits credit otherwise allowable for the taxable year which is disallowed pursuant to the provisions of (i) and (ii) shall be considered as an unused excess profits credit in respect of those members of the group by reference to which the amount of the credit disallowed under (i) and (ii) was determined, originating, for the purpose of the unused excess profits credit carry-back provisions, in a taxable year subsequent to the last taxable year in respect of which their income was included in a consolidated return, and, for the purpose of the unused excess profits credit carry-over provisions, in a taxable year prior to the first taxable year in respect of which their income was included in a consolidated return.
(iv) The provisions of subdivisions (i) and (ii) shall not apply with respect to the common parent corporation of an affiliated group formed subsequent to March 14, 1941, or to the common parent corporation or subsidiaries of a group in existence on March 14, 1941, acquiring new members subsequent to March 14, 1941, or with respect to subsidiaries becoming members of the group subsequent to March 14, 1941—
* * * * * * *
(d) To the extent to which, upon consideration of the facts or circumstances presented by the particular case, the Commissioner determines that a consolidated excess profits credit computed with respect to the affiliated group but without regard to subdivisions (i) and (ii) will not serve to distort the excess profits tax liability of the group or of any of its members.
(v) If, upon consideration of the facts and circumstances presented by the particular case, the Commissioner determines that the general purpose of the provisions of subdivisions (i) and (ii) would be better served in a particular respect by adherence to a date subsequent to March 14, 1941, such subdivisions shall be administered in that respect as if the appropriate date determined by the Commissioner were substituted in such subdivisions in lieu of the date March 14, 1941. Ordinarily, under the preceding sentence, the provisions of subdivisions (i) and (ii) shall not apply with respect to the formation or expansion of an affiliated group occurring after December 31, 1946, and before July 1, 1950.

to petitioners in this case, and (b) if applicable, whether it has been properly applied by respondent. No decided case wherein the application of this section of the regulations was involved has been called to our attention.

Section 24.31(b)(24) of the regulations provides that in the case of an affiliated group formed at any time subsequent to March 14, 1941, or having members which joined the group subsequent to March 14, 1941, the consolidated excess profits credit shall be determined subject to certain qualifications. Subdivision (i) provides that the portion of the consolidated excess profits credit otherwise allowable with respect to the common parent corporation shall not exceed (a) "[t]he portion of the consolidated section 433(a) excess profits net income for the taxable year attributable to such common parent corporation, in the case of a group formed subsequent to March 14, 1941." The group here involved was formed subsequent to March 14, 1941.

Subdivision (ii) applies the same limitation on the credit of a subsidiary corporation which became a member of the affiliated group after March 14, 1941, and subdivision (iii) provides that the disallowed portion of the credit otherwise allowable shall be considered as an unused excess profits credit with respect to the corporation whose credit is so disallowed in part.

Subdivision (iv) provides that the limitations in subdivisions (i) and (ii) shall not apply in certain circumstances. Under (iv)(d), they shall not apply to either the parent or subsidiary to the extent to which the Commissioner determines that a consolidated excess profits credit computed without regard to subdivisions (i) and (ii) will not serve to distort the excess profits tax liability of the group or any member thereof.

Subdivision (v) also provides that if, upon consideration of the facts of a particular case, the Commissioner determines that the general purpose of the provisions of (i) and (ii) would be better served by using some date subsequent to March 14, 1941, the subdivisions may be administered by substituting such later date. It further states that ordinarily the provisions of (i) and (ii) shall not apply to groups formed or expanded after December 31, 1946, and before July 1, 1950.

Unfortunately, the general purpose of the limitation provisions of subdivisions (i) and (ii) is not set forth in the regulations and respondent has not enlightened us with respect thereto on brief. Neither has he explained anywhere in his notice of deficiency, in the pleadings, or in his brief, why the limitation is being applied in this case or why he has computed it in the manner he did. On brief he simply explains what adjustments and computations were made in applying the limitation.

This procedure by the Commissioner has an important bearing on our decision of this issue in this case. Congress provided that those filing consolidated returns thereby consented to the regulations prescribed by the Treasury to require a clear reflection of income and excess profits tax liability and to prevent avoidance of tax where consolidated returns are filed. However, Congress did not intend that the Commissioner could arbitrarily interpret or apply his regulations contrary to the provisions of the Internal Revenue Code. This is particularly true in a case like the present one where the regulations would permit the Commissioner to determine in his own discretion what may or may not serve to distort the excess profits tax liability or better serve the general purpose of subdivisions (i) and (ii) of this section of the regulations. Neither the petitioners nor the Tax Court can tell whether the Commissioner's action in this case has been proper, improper, or arbitrary unless they know why he did it. The failure of the Commissioner in this case to explain to either the petitioners or this Court why he has applied this limitation provision of the regulations, how it is justified under the law, and why he has computed the limitation in the manner he has done so, seriously and unnecessarily handicaps both the petitioners and the Court and what is said hereafter must be read in the light of this situation.

In the Korean War excess profits tax law, applicable to taxable years ending after June 30, 1950, and beginning before January 1, 1954, and thus applicable to the 3 years here involved (sec. 430, *et seq.*, I.R.C. 1939), Congress imposed an excess profits tax on a taxpayer's adjusted excess profits net income. The adjusted excess profits net income upon which this tax was to be imposed was the excess profits net income less a credit. This credit could be determined either by the base period income method, or the invested capital method, the latter being used by petitioners here. The invested capital credit was specified percentages of invested capital. The effect of the allowance of this credit was that the excess profits tax was not imposed on net income up to the amount of the credit. While the law provided certain adjustments in determining the amount of the credit, it made no provision for limiting the credit after it was once determined.

Section 141, I.R.C. 1939, permitted the filing of consolidated returns under certain conditions, one of which was consent to all consolidated return regulations prescribed under subsection (b). Subsection (b) directed the Secretary to prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group making a consolidated return and of each member of the group may be returned, determined, computed, assessed, collected, and adjusted in such manner as to reflect clearly the income and excess

profits tax liability thereof, and in order to prevent avoidance of such tax liability. This subsection gives the Secretary broad powers in prescribing consolidated return regulations—but only within the scope of the authority granted, that being to permit a determination of the correct tax liability of the taxpayers and the various factors necessary for such determination, and to prevent tax avoidance. It does not give him authority to prescribe a regulation which will in practical application to a particular taxpayer or group of taxpayers impose a tax on income that would not otherwise be taxed (by limiting the excess profits credit) simply because the taxpayers exercise the privilege of filing consolidated returns, unless it is to prevent tax avoidance.

Section 24.31(b)(24) of Regulations 129, on its face purports to place qualifications or limits on the computation of the consolidated excess profits credit otherwise allowable, under a certain circumstance—that being the formation or expansion of the affiliated group subsequent to March 14, 1941. This circumstance alone would surely not justify limitation of an excess profits credit granted by law, unless its application in a particular case is necessary to determine the correct tax liability or prevent tax avoidance. This section of the regulations may be perfectly valid and warranted under the law if applied for the purposes mentioned—and presumably that was the "general purpose" for which it was promulgated. But in the absence of possible tax avoidance or some necessity for its use to properly determine the tax liability, we do not think it can be applied, without explanation, in the absolute discretion of the Commissioner.

It is true that by electing to file consolidated returns, petitioners consented to the regulations prescribed by the Commisioner under section 141(b). One answer to this is that it does not appear that section 24.31(b)(24), as applied to petitioners here, is authorized under section 141(b) of the Code. Further, petitioners were also entitled to rely on subdivision (iv)(d) of the regulations which provides that the limitation shall not apply if the circumstances of the case indicate that the consolidated excess profits credit computed without the limitation would not serve to distort the excess profits tax liability of the group or its members. Our attention is not directed to anything in this record which would indicate that the excess profits tax liability of this group for the years here involved would be distorted by computing the consolidated excess profits credit without regard to the limitations provided in subdivisions (i) and (ii) or that there was any tax avoidance scheme involved in this affiliation.

Even if this section of the regulations was applicable here, we do not think the limitation has been computed by respondent in a manner consistent with the wording of the regulations. This discussion

will also illustrate why we think respondent's application of this section of the regulations in this instance appears to impose an excess profits tax on income not taxed by law.

In computing the limitation on the consolidated excess profits credit under this section in this case, respondent starts with the net income of each company before the net operating loss deduction. He then adjusts the net income of the profit corporations by first allocating to each of them a proportionate part (prorated on the basis of income) of the current year's operating losses of the loss corporations. He then reduces the net income figure as so revised by allocating the net operating loss carryovers from 1948 and 1949 (which were consolidated return years) only to those corporations which contributed to the prior years' losses and in the amounts not previously absorbed by carrybacks to their separate return years. The excess profits net income of the individual corporation as so revised is then applied to the excess profits credit of the individual corporation as the limiting factor. In effect, this is an adjustment of the excess profits net income of the individual corporations, which is not provided for in the regulations themselves. The regulations provide that the credit otherwise allowable to the individual corporation shall not exceed "the portion of the *consolidated* section 433(a) excess profits net income for the taxable year *attributable*" to such corporation. (Emphasis added.) This appears to contemplate an attribution (in some manner not specified in the regulations) of a portion of the consolidated excess profits net income *after* it has been computed. This would involve deducting the consolidated net operating loss deduction from the consolidated net income to get consolidated excess profits net income, which is the starting point—rather than first deducting that portion of the net operating loss carryovers contributed by individual companies in prior years from their separate net incomes for the current year.

As a result of respondent's application of section 24.31(b)(24) of the regulations to this group for the year 1951, for example, the consolidated excess profits credit allowed was $941,627.04, whereas the consolidated excess profits credit as computed by respondent on the consolidated equity invested capital, adjusted for inadmissibles and new capital additions, according to law, was $1,287,515.46. Also the excess profits credit allowed with respect to the parent corporation, Bowser, Inc., was limited by respondent's application of this section to $887,862.78, whereas the excess profits credit of that corporation otherwise allowable, as computed by respondent, was $1,237,403.95.

Thus the application of section 24.31(b)(24) of Regulations 129 to these petitioners deprives them of a credit granted them by law, whether computed on an individual corporation basis or on a con-

solidated group basis, for no apparent reason authorized by law. We hold that this section of the regulations is not applicable to petitioners in the years here involved. This conclusion will automatically eliminate an admitted error made by respondent in computing the limitation for the year 1952.

*Decisions will be entered under Rule 50.*